IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BPZ Resources, Inc., | § | Case No.: 15-60016 |
| | § | |
| Debtor. | § | |

**DECLARATION OF J. DURKIN LEDGARD IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

Under 28 U.S.C. § 1746, I, J. Durkin Ledgard, declare as follows under penalty of perjury:

1.  I am the Chief Legal, Commercial and Administrative Officer of BPZ Resources, Inc. ("BPZ" or the "Debtor", and together with its direct and indirect subsidiaries, the "Company").  I have been employed by BPZ since 2007, and I am familiar with the day-to-day operations, business, and financial affairs of the Debtor.  I hold a law degree and B.S. in Marine Transportation.  I have over 30 years of experience in marine transportation and hold an Unlimited Tonnage Master's License issued by the U.S. Coast Guard.  Prior to joining BPZ, I was a partner at a law firm where I specialized in Admiralty and Maritime law.

2.  On March 9, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for Southern District of Texas (the "Court").  The Debtor intends to continue in the possession of its properties and the management of its business as a debtor in possession under the Bankruptcy Code.

3.  Unless otherwise stated, the facts set forth in this Declaration are based upon my personal knowledge as an officer of the Debtor, my review of relevant documentation and

financial information, information provided to me by employees of, and professional advisors retained by, the Debtor, and my opinions based upon my knowledge and information concerning the Debtor's operations and financial affairs.

4. Unless otherwise indicated, the financial information set forth in this Declaration is unaudited.

5. I submit this Declaration to explain, among other things, to this Court and other interested parties the circumstances surrounding the Debtor's determination to seek relief under chapter 11 of the Bankruptcy Code. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I. THE DEBTOR'S BUSINESS

**A.     General Background**

6. The Debtor is a Texas corporation, which was incorporated in 2007, is headquartered in Houston, Texas, and maintains an office in Victoria, Texas. Through its non-debtor subsidiaries, BPZ also maintains offices in Lima and Tumbes, Peru and Quito, Ecuador. Through its subsidiaries, BPZ is primarily engaged in the exploration, development and production of oil and natural gas in Peru. BPZ is the ultimate parent entity of the Company. A corporate organization chart for the Company is annexed hereto as Exhibit A.

7. As of the Petition Date, the Debtor had approximately 20 full-time employees. Additionally, approximately 65 full-time employees are employed by the Company's non-debtor subsidiaries.

**B.    Debtor's Operations**

(i)    Debtor's General Business Operations

8.    The Debtor itself is a holding company and engages in limited business operations in the United States. The business operations of BPZ are primarily technical, administrative and compliance related. As set forth more fully below, BPZ is also the issuer of the 2015 Notes and the 2017 Notes (each as defined below). The Debtor is the ultimate parent company of subsidiaries that engage in the exploration, development and production of hydrocarbons.

(ii)    License Contracts

9.    The Company, through a non-debtor subsidiary in Peru, BPZ Exploración & Producción S.R.L. ("BPZ E&P"), has four license contracts for the exploration and production of hydrocarbons covering approximately 2.2 million acres in northwest Peru and in the coastal waters off the northwest coast of Peru. The Company's license contracts cover four properties, referred to as "blocks". Block Z-1 is located in the coastal waters off the northwest coast of Peru; Block XIX, Block XXII and Block XXIII (collectively, the "Onshore Blocks") are located onshore in northwestern Peru. As described more fully below, the Company maintains a 51% working interest in Block Z-1 through a joint venture. The Company maintains a 100% working interest in each of the Onshore Blocks. Additionally, the Company, through an Ecuadorian branch of a non-debtor subsidiary, SMC Ecuador, Inc. ("SMC Ecuador"), owns a 10% non-operating net profits interest in an oil and gas producing property located in the southwest region of Ecuador (the "Ecuador Property").

(iii)    Block Z-1

10.    BPZ's rights to explore and produce hydrocarbons in Block Z-1 are subject, generally, to the Peruvian hydrocarbon laws and specifically, a license contract (the "Block Z-1

License") between BPZ E&P and Perupetro S.A. ("Perupetro"), a corporation owned by the Peruvian government empowered to enter into contracts for the exploration and/or exploitation of hydrocarbons in Peru. The Block Z-1 License was signed in November 2001 and, among other things, requires specified exploration obligations in defined time periods. Commercial production in Block Z-1 commenced in 2010. As described more fully below, BPZ has guaranteed the current exploration obligation under the Block Z-1 License. Block Z-1 is currently in the exploitation phase of the contract.

11.   In April 2012, the Company formed an unincorporated joint venture with a subsidiary of Pacific Rubiales ("PRE") to explore and develop Block Z-1. PRE provides certain technical and operating services to the joint venture, as set forth in a joint operating agreement between the parties (the "JOA"). Block Z-1 development is determined and supervised by a joint operating committee that includes representatives from PRE and the Company. Decisions regarding budgeting capital expenditures require unanimous consent between BPZ E&P and PRE. Once certain capital expenditures are approved, the JOA requires that each party fulfill its expenditure obligations or be subject to certain penalties.

12.   Under the JOA, the operating costs and capital expenditures related to the operation and development of Block Z-1 are funded by "cash calls" on the parties to the joint venture that require satisfaction of each party's proportional share of costs and capital expenditures on monthly basis. Each partner has 15 days to satisfy a properly documented cash call. To the extent a joint venture party does not timely satisfy a required cash call, such party may be in default under the JOA. BPZ E&P's obligations to make payments on account of cash calls under the JOA have historically been funded by the Debtor and its subsidiaries.

13.     Block Z-1 is currently the Company's only revenue-producing property. Block Z-1 currently has two producing oil fields, Corvina and Albacora. Corvina currently has thirteen (13) producing oil wells operated off of two platforms. As of February 2015, the production from Corvina was approximately 1,600 barrels of oil per day ("bopd") net to the Debtor's interest. Albacora currently has six producing wells operated off of one platform. As of February 2015, the production from Albacora was approximately 800 bopd net to the Debtor's interest. The daily production rates at both Corvina and Albacora are subject to significant fluctuation given the small number of wells in each field. Production from the fields at Block Z-1 is transported by tanker to the Perupetro refinery in Talara, Peru. Block Z-1 also contains non-producing prospects and leads that are currently under exploration.

(iv)    The Onshore Blocks

14.     The rights to explore and produce hydrocarbons in the Onshore Blocks are similarly subject to Peruvian hydrocarbon laws and specifically, to separate license contracts between the Company and Perupetro. The Block XIX contract was signed in December 2003 and the Blocks XXII and XXIII contracts were signed in November 2007. The Onshore Blocks are currently in the exploration phase and are not producing revenue.

(v)     Ecuador Property

15.     The Company, through SMC Ecuador, owns a 10% non-operating net profits interest with a consortium of investors in the Ecuador Property. The block located at the Ecuador Property is operated by Pacifpetrol S.A. Although the Ecuador Property is currently producing hydrocarbons, the Debtor does not expect to receive any significant revenue from the Ecuador Property within the current calendar year.

C.  **Capital Structure**

  (i) Stockholders' Equity

16. BPZ is a publicly traded company that, until March 2, 2015, was listed on the New York Stock Exchange ("NYSE").[1] As of December 31, 2014, BPZ had approximately 118.7 million shares of common stock outstanding. Additionally, BPZ has issued stock options and restricted stock grants to certain senior-level executives and managers.

17. As BPZ is a publicly traded company, its common equity is widely held. The holders of more than 5% of BPZ's common stock (as of September 30, 2014) are reflected on Exhibit A to the Debtor's bankruptcy petition.

  (ii) 6.5% Convertible Notes Due 2015

18. In February 2010, BPZ issued approximately $161 million in principal amount of 6.5% Convertible Notes due 2015 (the "2015 Notes"), pursuant to that certain Indenture (the "2015 Notes Indenture") among BPZ as issuer, and Wells Fargo Bank, National Association ("Wells Fargo"), as indenture trustee. Additional 2015 Notes were issued on March 12, 2010 in an amount of approximately $10 million. The 2015 Notes are unsecured and are not guaranteed by any of the Debtor's subsidiaries. The scheduled maturity for the 2015 Notes was March 1, 2015, with a 10 day grace period with respect to payments to be made upon maturity.

19. In September 2013, following the issuance of the 2017 Notes (defined below), BPZ repurchased approximately $85 million in principal amount of the 2015 Notes. In April 2014, BPZ retired approximately $26 million in principal amount of the 2015 Notes. As of the Petition Date, approximately $59.9 million in principal amount was outstanding under the 2015 Notes.

---

[1] On March 2, 2015, the NYSE notified BPZ that trading in BPZ's common stock would be suspended and that the NYSE would commence proceedings to delist the common stock.

      (iii)    <u>8.5% Convertible Notes Due 2017</u>

20. In September 2013, BPZ issued approximately $143.8 million in principal amount of 8.5% Convertible Notes due 2017 (the "<u>2017 Notes</u>, and together with the 2015 Notes, the "<u>Convertible Notes</u>"), pursuant to that certain Indenture (the "<u>2017 Notes Indenture</u>") among BPZ as issuer, and Wells Fargo, as indenture trustee. In April 2014, in connection with the retirement of certain of the 2015 Notes (described above), BPZ issued approximately $25 million in additional 2017 Notes. The 2017 Notes are unsecured and are not guaranteed by any of the Debtor's subsidiaries. The scheduled maturity for the 2017 Notes is October 1, 2017. As of the Petition Date, approximately $168.7 million in principal amount was outstanding under the 2017 Notes.

      (iv)    <u>Parent Guaranty</u>

21. Pursuant to the Block Z-1 License, BPZ has provided a parent company guaranty (the "<u>Parent Guaranty</u>") of the exploration obligations of BPZ E&P thereunder. Additionally, it is a requirement under the Block Z-1 License that the Parent Guaranty remain in place. Any impairment of the Parent Guaranty could jeopardize the Company's interest in the Block Z-1 License and, therefore, the value of the Debtor's estate. Accordingly, it is the intention of the Debtor not to impair the Parent Guaranty and have the Parent Guaranty remain unaffected by the Chapter 11 Case.

      (v)    <u>Trade Debt</u>

22. As set forth above, because the Debtor is a holding company, it does not have substantial trade creditors. The operations of the holding company Debtor are primarily administrative in nature. Accordingly, the majority of the Debtor's trade creditors include attorneys, accountants and other professionals, as well as vendors related to the Debtor's status

as a public company. As of the Petition Date, the Debtor estimates that only a <u>de minis</u> amount of trade obligations of the Debtor is outstanding.

**D.     Events Leading to Chapter 11**

23.     The oil industry generally, and the Company in particular, has been hit hard by the swift and drastic drop in crude oil prices. With a March 2015 maturity looming under the 2015 Notes, the decline in the oil market made traditional capital markets solutions unworkable. In October 2014, BPZ began exploring possible strategic alternatives to address its financial situation and upcoming debt maturity for the 2015 Notes. In connection with these efforts, BPZ retained Houlihan Lokey ("<u>Houlihan</u>") as an investment banker and Stroock & Stroock & Lavan LLP ("<u>Stroock</u>"), as legal counsel.

(i)     Third Party Process

24.     In December 2014, Houlihan began its analysis of the Company's operations, historical financial results, prospective outlook and liquidity. Houlihan, with the assistance of Stroock, the Company's management and the Special Committee of the Board of Directors ("<u>Special Committee</u>"), prepared materials for investors potentially interested in a transaction with the Company (the "<u>Investor Materials</u>"). On January 20, 2015, Houlihan launched its process to obtain capital from financial or strategic investors (the "<u>Third Party Process</u>"). In connection with the Third Party process, Houlihan contacted a targeted list of more than 60 potentially interested investors, including both domestic and international strategic and financial investors. Seven of the parties contacted entered into non-disclosure agreements ("<u>NDAs</u>") with the Company to further explore a potential strategic transaction. A virtual data room was established containing extensive information about the Company, including the Investor Materials and other information describing the Company's business and financial results.

(ii)   Noteholder Process

25.   During the Third Party Process, the Special Committee, in consultation with BPZ' advisors determined that Houlihan should also solicit proposals from an informal group of holders of the Convertible Notes (the "Ad Hoc Group").  Accordingly, in January 2015, Stroock and Houlihan entered into discussions with counsel and a financial advisor to the Ad Hoc Group (the "AHG Advisors").  Houlihan provided the AHG Advisors with access to a virtual data room and the Investor Materials, and (together with Stroock and the Company's management) met with the AHG Advisors regarding a potential restructuring.

26.   In February 2015, the members of the Ad Hoc Group executed NDAs with the Company and received certain diligence information, including portions of the Investor Materials, in connection with a potential transaction.  Following the initial meeting, the Company's advisors worked closely with the AHG Advisors regarding a potential transaction. Throughout February and early March of 2015, the Debtor and the Ad Hoc Group, and their respective advisors) participated in several meetings and discussions both in person and telephonically.

27.   As of the Petition Date, the Debtor was still in negotiations with the Ad Hoc Group and the AHG Advisors regarding the terms of a potential restructuring.[2]  Additionally, the Debtor is in discussions with third parties regarding potential postpetition secured debtor-in-possession financing ("DIP Financing").  Although such discussions are ongoing, the Debtor has not agreed to the terms of any DIP Financing or restructuring proposal at this time.  Given the upcoming expiration on the grace period for the maturity of the 2015 Notes, the Debtor's board

---

[2]   Pursuant to the NDAs between the Debtor and the members of the Ad Hoc Group, the Debtor has filed a Form 8-K including portions of the Investor Materials and other potential material non-public information provided to the members of the Ad Hoc Group.

9

determined that filing this Chapter 11 Case is the best way to preserve value of the Debtor's estate and is the best interest of all stakeholders.

## II. FIRST DAY MOTIONS

28. Contemporaneously with this Declaration, the Debtor has filed a number of so-called "First Day Motions" in the Chapter 11 Case seeking orders granting various forms of relief. I believe that, among other things, the relief requested in the First Day Motions is necessary to enable the Debtor to operate with minimal disruption during the pendency of the Chapter 11 Case.

### A. Administrative Motions

(i) Notice Procedures Motion

29. The Debtor requests entry of an order authorizing the establishment of certain notice, case management and administrative procedures (the "Notice Procedures"). I understand that these Notice Procedures will promote the efficient and orderly administration of this Chapter 11 Case by, among other things: (a) limiting service of documents filed in the case to those parties that have an interest in the subject matter thereof; and (b) authorizing electronic service. At the same time, the Notice Procedures ensure that appropriate notice is provided, and do not seek to waive the substantive rights of any party in interest in this Chapter 11 Case.

30. I believe that the relief requested in the Notice Procedures Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Notice Procedures Motion should be approved.

(ii) <u>Schedules and Statements Motion</u>

31. The Debtor requests entry of an order (a) granting additional time to file its schedules and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") and (b) waiving the requirements to file a list of all equity security holders (the "<u>Equity Holders List</u>") within 14 days after the Petition Date. The Debtor maintains voluminous books and records and complex accounting systems. I submit that the large amount of information that must be assembled to prepare the Schedules and Statements and the employee and advisor hours required to complete the Schedules and Statements would be unnecessarily burdensome to the Debtor during the two weeks following the Petition Date.

32. Additionally, I believe that preparing the Equity Holders List will be burdensome, time-consuming, expensive and serve little or no beneficial purpose.

33. I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable the Debtor to continue to operate its business in Chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Schedules and Statements Motion should be approved.

B. **Operational Motions**

(i) <u>Employee Wages Motion</u>

34. The Debtor requests the entry of a final order authorizing the Debtor, in its sole discretion, to pay prepetition wage claims, to honor obligations and to continue programs, in the ordinary course of business and consistent with past practices, relating to Employee Wages and Benefits, as defined in the Employee Wages Motion. As noted above, as of the Petition Date, the Debtor employs approximately 20 full time employees. Because the timing of the bankruptcy

filing falls in between pay periods, certain prepetition Employee obligations are currently due and owing.

35. I believe that the majority of the Debtor's Employees rely exclusively on their compensation, benefits, employee programs and reimbursement of expenses provided by the Debtor to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtor is not permitted to honor obligations to the Employees for unpaid compensation, benefits and reimbursable expenses. Moreover, I also believe that if the Debtor is unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. In the absence of such payments, I believe that the Debtor will suffer irreparable harm and the Debtor's Employees may seek alternative employment opportunities.

36. I believe that the relief requested in the Employee Wages Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable the Debtor to continue to operate its business in Chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Employee Wages Motion should be approved.

    (iii)    <u>Cash Management Motion</u>

37. Under the Cash Management Motion, the Debtor requests the entry of an order (a) authorizing the continued use of its centralized cash management system and procedures (the "<u>Cash Management System</u>"); (b) authorizing and directing all of the Debtor's banks (the "<u>Banks</u>") that process checks and fund transfers on account of any prepetition obligations which have been authorized by this Court to be paid ("<u>Prepetition Payment Obligations</u>") to receive, process, honor and pay all of the Debtor's prepetition checks and fund transfers on account of such Prepetition Payment Obligations; (c) authorizing the maintenance and continued use of its

existing bank accounts (the "Bank Accounts") and business forms, and a waiver of certain guidelines relating to the Bank Accounts, and (d) authorizing the continued use of its existing deposit and investment practices.

38. In the ordinary course of business, the Debtor maintain its Cash Management System, which provides mechanisms for the collection and disbursement of funds used in the Debtor's operations and maintains current and accurate accounting records of the transactions within the Cash Management System. In particular, the ability of the Debtor to continue to use its Cash Management System to make transfers to its non-debtor subsidiaries in the ordinary course of business is crucial to maintaining the value of the Debtor's assets (particularly Block Z-1, which is operated under the JOA) and the Debtor's restructuring efforts.

39. I believe that if the Debtor was required to comply with the guidelines of the U.S. Trustee, the burden of opening new bank accounts, revising cash management procedures, and the immediate ordering of new checks and business forms with a "Debtor-in-Possession" legend, would severely disrupt and cause irreparable harm to the Debtor's business, and cause additional confusion, delay and cost at this critical time, including disrupting and impacting the Debtor's ability to pay wages to its employees and to continue as a going concern. It is my belief that the relief requested in the Cash Management Motion is vital to ensuring the Debtor's seamless transition into bankruptcy.

40. Authorizing the Debtor to maintain its Cash Management System will avoid many of the possible disruptions and distractions that could divert its attention from more critical matters during the initial days of the Chapter 11 Case. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable the Debtor to continue to operate its business in Chapter

11 without disruption.  Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

     (iv)   <u>Utilities Motion</u>

     41.    In connection with the operation of its business, the Debtor obtains utility services from various Utility Companies.  The Debtor is seeking an order of this Court prohibiting the Utility Companies from altering or discontinuing services and deeming the Utility Companies adequately assured of future performance by virtue of the Debtor's proposed adequate assurance.

     42.    To provide adequate assurance of payment for future services to the Utility Companies, the Debtor proposes to provide each Utility Company with a deposit equal to two (2) weeks of Utility Service, calculated as a historical average over the past 12 months.

     43.    I believe that this deposit constitutes sufficient adequate assurance to the Utility Companies.  However, in light of the adverse consequences to the Debtor of any interruption in services by the Utility Companies and the recognition that Utility Companies have the right to evaluate the proposed adequate assurance on a case-by-case basis, if any Utility Company believes additional assurance is needed, the Debtor has proposed procedures for the Utility Companies to request such additional adequate assurance.  I believe these procedures, are not only fair and reasonable, but also necessary for the Debtor to be able to continue to operate properly.

     44.    I believe that without the relief requested in the motion, the Debtor could be forced to address requests by Utility Companies at a critical period in its reorganization efforts, and during a time when its efforts could be more productively focused for the benefit of all of its stakeholders.  Accordingly, on behalf of the Debtor, I respectfully submit that the Utilities Motion should be approved.

**C.**     **Retention-Related Motions**

45.     The Debtor seeks to retain Kurtzman Carson Consultants ("KCC") as claims and noticing agent. I believe that by retaining KCC in the Chapter 11 Case, the Debtor's estate, and particularly its creditors, will benefit from KCC's service. KCC has developed efficient and cost-effective methods in its area of expertise. I am of the opinion that KCC is fully equipped to handle the volume of mailing involved in properly sending the required notices to creditors and other interested parties in the Chapter 11 case and, therefore, respectfully submit that the Claims Agent Retention Application should be approved.

46.     The Debtor will also be filing additional motions seeking to retain, among others, Stroock, as primary bankruptcy counsel; Hawash Meade Gaston Neese & Cicack LLP, a local Texas counsel; Houlihan, as investment banker and financial advisor; and Baker Hostetler as audit committee special counsel. The Debtor also intends to file a motion regarding interim compensation, seeking authorization and establishing procedures for compensating and reimbursing professionals on a monthly basis, on terms comparable to the procedures established in other chapter 11 cases in this district.

47.     Additionally, the Debtor intends to file a motion authorizing the Debtor to retain certain professionals utilized in the ordinary course of its business without the submission of separate retention applications and the issuance of separate orders approving the retention of each individual professional and authorizing the Debtor to pay each such professional in accordance with the terms set forth in the motion without application to the Court by such professional, subject to monthly caps. The Debtor anticipates that such motions will be considered at the first omnibus hearing to be held for this Chapter 11 Case.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on March 9, 2015 in Houston, Texas.

> By: /s/ J. Durkin Ledgard
> Name: J. Durkin Ledgard
> Title: Chief Legal Officer