**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BPZ Resources, Inc., | § | Case No.: 15-60016 (DRJ) |
| | § | |
| Debtor. | § | |

---

**DEBTOR'S EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105(A) AND 363 AND BANKRUPTCY RULES 2002 AND 6004 FOR ORDERS (I) (A) APPROVING BIDDING PROCEDURES AND NOTICE PROCEDURES RELATED TO THE PROPOSED SALE OF ASSETS AND (B) SCHEDULING A HEARING ON APPROVAL OF THE PROPOSED SALE OF ASSETS; (II) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF CLAIMS AND LIENS; (III) AUTHORIZING THE DEBTOR TO TAKE CERTAIN CORPORATE ACTIONS TO PURCHASE THE <u>TURBINE ASSETS AND (IV) GRANTING RELATED RELIEF</u>**

**<u>NOTICE UNDER BLR 9013-1(B) AND 9013-1(I)</u>**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE BANKRUPTCY COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.

** <u>A HEARING ON THIS MOTION HAS BEEN SCHEDULED FOR FRIDAY, JUNE 12, 2015 AT  9:00 AM (HOUSTON TIME) IN COURTROOM 400 AT THE BANKRUPTCY COURT LOCATED AT 515 RUSK AVENUE HOUSTON, TEXAS 77002.</u>

IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

TO THE HONORABLE DAVID R. JONES, UNITED STATES BANKRUPTCY JUDGE:

The debtor and debtor-in-possession in the above-captioned case (the "Debtor", and together with its direct and indirect subsidiaries, the "Company") files the *Debtor's Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 and Bankruptcy Rules 2002 and 6004 for Orders (I) (A) Approving Bidding Procedures and Notice Procedures Related to the Proposed Sale of Assets and (B) Scheduling a Hearing on Approval of the Proposed Sale of Assets; (II) Approving the Sale of Assets Free and Clear of Claims and Liens; (III) Authorizing the Debtor to Take Certain Corporate Actions to Purchase the Turbine Assets and (IV) Granting Related Relief* (the "Motion").  In support of the Motion, the Debtor respectfully submits the following:

## BASIS FOR EMERGENCY RELIEF

1.      As set forth more fully herein, since the filing of this Chapter 11 case (the "Chapter 11 Case"), the Debtor and its advisors have been in negotiations with various parties in an effort to obtain sufficient committed postpetition financing or an acceptable stalking horse bid for its assets.  Although several parties expressed interest in a transaction, as of the filing of this Motion, the parties were not able to reach such an agreement.  The Debtor has continued to negotiate with interested parties, including throughout the weekend leading up to the filing of this Motion, in hopes of filing a motion including such financing or a stalking horse agreement.

2.      The Debtor has determined that it could wait no longer to file this Motion because, as set forth more fully below, PRE (as defined below) has now declared a default under the JOA (as defined below).  As a result, the Debtor must now move quickly to consummate a sale within less than three weeks to prevent the deterioration of its assets.  To consummate a

value-maximizing transaction in such a rapid timeframe, the Debtor seeks approval to start its bidding and sale process immediately, as every day that passes will make the process more truncated in the face of the pending JOA default.

## PRELIMINARY STATEMENT

3.    The Debtor is a holding company that, through its non-debtor subsidiaries, is primarily engaged in the exploration, development and production of oil and gas in Peru.  Since its inception, the Company has been dependent on continuous infusions of capital to finance the exploration and development of its oil and gas properties.  To date, nearly $800 million in debt and equity has been invested in the Company's assets, and significant additional capital would be required to develop those assets to their full potential.  In particular, the Company is required, on a monthly basis, to spend millions of dollars in developmental capital expenditures, which are paid through "cash calls" under the JOA through which it operates its assets located in Peru.

4.    This Chapter 11 Case was commenced in an effort to recapitalize and restructure the Debtor to allow the Company to continue the exploration and development of its assets for the benefit of all of its stakeholders.  Unfortunately, given the current market pricing for oil and gas and the effect that such pricing climate has had on access to capital markets for oil and gas projects in the development stages—and notwithstanding an exhaustive search by the Debtor and its professionals—the Debtor has been unable to attract the amount of new capital necessary to recapitalize the business.  As a result, the Company's liquidity position has become such that although the Debtor can satisfy the pending cash call obligation without additional financing, the Debtor would not likely have enough cash to make any future cash calls.  Because a failure to pay any cash calls could result in a default under the JOA, the Debtor would receive little benefit from making the pending cash call without continuing to pay the cash calls going forward.

5.      Additionally, given the Debtor's current liquidity position, paying the pending cash call would likely leave the Company with little cash and, absent further funding or a sale transaction, even an orderly wind down would be difficult.  Reluctantly, the Debtor's board of directors elected not to make the pending cash call payment and has determined that it is in the best interest of the Debtor's estate, subject to the approval of this Motion, to commence an expedited sale process of the Debtor's assets.  This determination was made by the Debtor in consultation with the official committee of unsecured creditors (the "Committee").

6.      As more fully set forth below, the Debtor seeks: (i) approval of certain bidding and notice procedures related to an expedited sale of the Debtor's assets, and (ii) ultimate approval of such sale following a Sale Hearing (defined below).  Additionally, the Debtor seeks authority to take such actions (either through board or management action, as appropriate) that are reasonable and necessary to permit the Debtor to purchase the Turbine Assets (as defined below), currently owned by its subsidiary, for the ultimate benefit of the Debtor's stakeholders. The Debtor submits the foregoing provides the Debtor with the best opportunity to maximize the value of its assets and is in the best interest of all stakeholders under the circumstances.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of Reference from the United States District Court for the Southern District of Texas, dated as of May 24, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105(a) and 363 of title 11

of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 6004,

9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## PROCEDURAL BACKGROUND

9.      On March 9, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for

relief in this Court under the Bankruptcy Code.

10.      The Debtor continues to operate its business as debtor-in-possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.   No request has been made for the

appointment of a trustee or an examiner.

11.      On April 14, 2015, the United States Trustee for the Southern District of Texas

(the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code.

## BACKGROUND

A.  *General Background*

12.      The Debtor is a Texas corporation, which was incorporated in 2007, is

headquartered in Houston, Texas, and maintains an office in Victoria, Texas.  Through its non-

debtor subsidiaries, the Debtor also maintains offices in Lima and Tumbes, Peru and Quito,

Ecuador.  The Debtor is a holding company and engages in limited business operations in the

United States.  Through its subsidiaries, the Debtor is primarily engaged in the exploration,

development and production of oil and natural gas in Peru.  The business operations of the

Debtor are primarily technical, administrative and compliance related.

B.  *Licenses*

13.      The Debtor, through its non-debtor subsidiary, BPZ Exploración & Producción

S.R.L. ("BPZ E&P"), has four license contracts for the exploration and production of

hydrocarbons covering approximately 2.2 million acres in northwest Peru and in the coastal

waters off the northwest coast of Peru.  The Company's license contracts cover four properties,

referred to as "blocks".  Block Z-1 is located in the coastal waters off the northwest coast of Peru; Block XIX, Block XXII and Block XXIII (collectively, the "Onshore Blocks") are located onshore in northwestern Peru.  The Debtor maintains a 51% working interest in Block Z-1 through a joint venture.  The Debtor maintains a 100% working interest in each of the Onshore Blocks.

14.     The Company's rights to explore and produce hydrocarbons in Block Z-1 are subject, generally, to the Peruvian hydrocarbon laws and specifically, a license contract (the "Block Z-1 License") between BPZ E&P and Perupetro S.A. ("Perupetro"), a corporation owned by the Peruvian government empowered to enter into contracts for the exploration and/or exploitation of hydrocarbons in Peru.  The Block Z-1 License was signed in November 2001 and, among other things, requires specified exploration obligations in defined time periods. Commercial production in Block Z-1 commenced in 2010. The Debtor has guaranteed the current exploration obligation under the Block Z-1 License.  Block Z-1 is currently in the exploitation phase of the contract.

*C.   The JOA*

15.     In April 2012, the Company formed an unincorporated joint venture with a subsidiary of Pacific Rubiales ("PRE") to explore and develop Block Z-1.  PRE provides certain technical and operating services to the joint venture, as set forth in a joint operating agreement between the parties (the "JOA").  Block Z-1 development is determined and supervised by a joint operating committee that includes representatives from PRE and the Company.  Decisions regarding budgeting capital expenditures require unanimous consent between BPZ E&P and PRE.  Once certain capital expenditures are approved, the JOA requires that each party fulfill its expenditure obligations or be subject to certain penalties.

16.     Under the JOA, the operating costs and capital expenditures related to the operation and development of Block Z-1 are funded by "cash calls" (each, a "Cash Call") on the parties to the joint venture that require satisfaction of each party's proportional share of costs and capital expenditures on monthly basis.  BPZ E&P's obligations to make payments on account of Cash Calls under the JOA have historically been funded by the Debtor and its subsidiaries.

### D.   *The Offshore Production*

17.     Block Z-1 is currently the Company's only revenue-producing property.  As of April 22, 2015, Block Z-1 was producing approximately 2,206 barrels of oil per day net to the Debtor's interest.  Block Z-1 currently has two producing oil fields, Corvina and Albacora.  Corvina currently has thirteen (13) producing oil wells operated off of two platforms.  Albacora currently has six (6) producing wells operated off of one platform.  The daily production rates at both Corvina and Albacora are subject to fluctuation given the small number of wells in each field.  Production from the fields at Block Z-1 is transported by tanker to the Perupetro refinery in Talara, Peru.  Block Z-1 also contains non-producing prospects and leads that are currently under exploration.

### E.   *The Onshore Blocks*

18.     The rights to explore and produce hydrocarbons in the Onshore Blocks are similarly subject to Peruvian hydrocarbon laws and specifically, to separate license contracts between the Company and Perupetro.  The Block XIX contract was signed in December 2003 and the Blocks XXII and XXIII contracts were signed in November 2007.  The Onshore Blocks are currently in the exploration phase and are not producing revenue.

### F.   *Other Assets*

19.     In addition to the foregoing, the Company owns various other assets, including certain marine barges, owned by BPZ Marine Peru S.R.L., and three GE LM 6000 PD Sprint 45

megawatt turbines (the "Turbine Assets"), owned by Empresa Electrica Nueva Esperanza, S.R.L. ("EENE"). The Company, through an Ecuadorian branch of a non-debtor subsidiary, SMC Ecuador, Inc., also owns a 10% non-operating net profits interest in an oil and gas producing property located in the southwest region of Ecuador (the "Ecuador Property").

G. *Debtor's Marketing Efforts*

20.     Prior to the Petition Date, the Debtor and its advisors undertook a marketing process with respect to strategic alternatives and financing options for the Company. In connection with the prepetition process, Houlihan Lokey Capital, Inc. ("Houlihan"), the Debtor's investment banker, contacted a targeted list of more than 60 potentially interested investors, including both domestic and international strategic and financial investors. Several of the parties contacted entered into non-disclosure agreements with the Company to further explore a potential strategic transaction. At the same time, the Debtor engaged in negotiations with a group of holders of the Debtor's convertible notes (the "Ad Hoc Group") regarding financing and recapitalization options.

21.     Following the filing of this Chapter 11 Case, the Debtor and its advisors continued discussions and negotiations with the intent of finding the best available value-maximizing transaction for the Debtor, whether a financing or sale, or combination of both. Faced with continuing Cash Calls under the JOA, and depleting cash, the Debtor, with the assistance of its advisors, furthered its efforts to solicit offers for postpetition financing. In seeking such financing, through its advisors, the Debtor contacted approximately 35 parties, including alternative funding sources in addition to the Ad Hoc Group. As a result of this process, the Debtor received non-binding proposals for debtor-in-possession financing from various parties, some of which contemplated that the proposed lender(s) would become a

8

stalking horse bidder in the event of a sale of the Debtor's assets.  The Debtor engaged in substantial negotiations with the various parties regarding the terms of potential financing and/or transactions, but after weeks of negotiations, the Debtor was unable to reach an agreement with any of the parties as of the filing of this Motion.

H.  *The April Cash Call and Default Notice*

22.     To preserve the value of the Company's assets, during the marketing process and financing solicitation, the Debtor had been timely making its Cash Call payments as required by the JOA.  Under the JOA, each partner has fifteen (15) days to satisfy a properly documented Cash Call.  To the extent a joint venture party does not timely satisfy a required Cash Call payment, such party may be in default under the JOA.  If a notice of default is provided, the party in default has five (5) business days to cure such default.

23.     Since the Petition Date, and in accordance with the terms of the cash management orders [Dkt. Nos. 36, 90] entered in this Chapter 11 Case, the Debtor has made the Cash Call payments for February and March, which were due on March 25, 2015 and April 29, 2015, respectively, totaling approximately $28 million.  Pursuant to the JOA, on May 12, 2015, the Debtor received a request from PRE for a Cash Call payment for April in the amount of approximately $9.8 million (the "April Cash Call").

24.     The April Cash Call was due by its terms on May 27, 2015.  Although the Debtor has sufficient cash to satisfy the April Cash Call, given the Company's liquidity position and lack of postpetition financing, the Debtor would be unable to make any additional Cash Call payments going forward.  Accordingly, the Debtor, in consultation with the Committee, determined it was in the best interest of the estate not to make the April Cash Call payment when due.  On May 28, 2015, the Debtor received a notice of default under the JOA from PRE (the

"Default Notice").  Pursuant to the Default Notice, the last day for the Debtor to cure the default relating to the April Cash Call was June 5, 2015.[1]  Under the JOA, five (5) business days after receipt of a Default Notice, the Debtor (through its subsidiaries), would be subject to certain penalties.  Additionally, if the default is not cured within thirty (30) days after receipt of the Default Notice, PRE may be able to foreclose on BPZ E&P's JOA interest.[2]

25.     Despite its best efforts, the Debtor has been unable to obtain postpetition financing or a stalking horse bidder for its assets as of the filing of this Motion.  Given that there are significant demands on the Debtor's cash and the prospects of its assets are further deteriorating, the Debtor has determined in its business judgment to undertake a rapid sale of its assets.  The Debtor does not believe that it would be a proper exercise of its business judgment to continue to deplete estate assets to fund the costs associated with maintaining the business operations (including the Cash Calls) given the significant challenges described above.

## THE PROPOSED ACTIONS

A.  *Sale of the Assets*

26.     The Debtor has determined that it is in the best interest of the estate to undertake a rapid sale process (the "Sale Process") for its assets.  By this Motion, the Debtor seeks approval from this Court to solicit bids for the equity interests of its direct subsidiaries (the "Equity Interests"), which through additional subsidiaries, own the Debtor's oil and gas assets located in Peru.  While the proposed sale contemplates a purchase of the Equity Interests, to encourage bidders to submit bids, the proposed Sale Process will permit potential bidders to bid for any combination of the assets of the Debtor or its subsidiaries (other than the Turbine Assets) (the

---

[1]     The Debtor disputes that there is a valid default under the JOA with respect to the April Cash Call and reserves all rights with respect thereto.

[2]     The Debtor does not concede that PRE may foreclose within 30 days, and reserves the right to challenge any such actions.

assets purchased in the sale, the "<u>Purchased Assets</u>").[3]  To the extent the Sale Process results in a proposed transaction that the Debtor believes is in the best interest of its creditors and its estate, the Debtor will then ask the Court to hold a sale hearing (the "<u>Sale Hearing</u>") and approve the sale of the Purchased Assets (the "<u>Sale</u>").

27.     The Debtor's interest in the JOA and the offshore blocks it controls is one of its most valuable assets.  Because of the lack of committed postpetition financing and the Debtor's election to not timely make the April Cash Call, PRE has declared a default with respect to BPZ E&P's obligations under the JOA and may seek to invoke the remedial provisions of the JOA. Consequently, if it wishes to run a meaningful Sale Process, the Debtor must conduct a sale on an expedited timeline that provides for a closing prior to June 27, 2015.[4]

28.     To effectuate a sale closing prior to June 27, 2015 and provide sufficient time for the Debtor to run a meaningful and value-maximizing sale process, the Debtor requests the authority to commence the process immediately.  Accordingly, as set forth in the Bidding Procedures attached hereto, the Debtor proposes: (a) the entry of the Bidding Procedures Order as soon as reasonably practicable, (b) a Bid Deadline of June 19, 2015; (c) an auction date of June 23, 2015; and (d) the entry of the Sale Order by no later than June 25, 2015.  While such a timeline is compressed, it is appropriate under the circumstances because of the Debtor's need to prevent any further erosion of the value of the estate and given that multiple potentially interested parties continue to evaluate a bid for the assets.

---

[3]     As described more fully below, the Debtor intends to market and sell the Turbine Assets pursuant to a separate process.

[4]     As set forth above, the Debtor does not concede that PRE may take such actions in such a time period (if at all), but a potential purchaser would likely require a sale to close prior to PRE taking such actions.

29.     The Debtor believes that the procedures proposed herein with respect to the Auction, which allows for a sale of its assets, are the best way to maximize value for the Debtor's estate, its creditors and stakeholders.

B.   *The Turbine Asset Purchase*

30.     Additionally, and in an effort to consolidate its assets and provide maximum distributions to creditors, the Debtor seeks to repurchase the Turbine Assets from its subsidiary. The Turbine Assets, which were purchased for approximately $52 million using the Debtor's funds, are of significant value to the Company.  The Debtor seeks approval of a transaction (the "Turbine Asset Purchase"), pursuant to which the Debtor, through its corporate structure, would acquire the Turbine Assets from EENE as repayment for the intercompany debt owed by EENE to the Debtor, through its subsidiary structure, on account of funds loaned to EENE to purchase the Turbine Assets.  The amount of such repayment will be based on the fair market value of the Turbine Assets, which will be informed by recent transactions for similar units and the Company's marketing efforts with respect to the Turbine Assets.  The Debtor believes that repurchasing the Turbine Assets is in the best interest of the estate and will allow the Debtor to maximize the value of such assets.

31.     Following the Turbine Asset Purchase, the Debtor will seek to sell the Turbine Assets pursuant to a subsequent sale process.

C.   *The Proposed Bidding Procedures*

32.     In order to optimally and expeditiously solicit, receive, and evaluate bids in a fair and open manner, the Debtor has developed and proposed bidding procedures to govern the Sale (the "Bidding Procedures"), which are annexed as Exhibit 1 to the Bidding Procedures Order attached hereto as **Exhibit A** (the "Bidding Procedures Order").   Although the Bidding

Procedures are structured to govern a sale of the Equity Interests, the Debtor intends to accept bids for the purchase of any combination of the Company's assets.  To the extent that such combination bids are received by the Debtor, such bids will also be governed by the Bidding Procedures set forth below.  Bidding Procedures are designed to encourage all entities to put their best bids forward as timely as possible and to maximize the value of the Debtor's assets. Pursuant to this Motion, the Debtor is requesting approval of the Bidding Procedures and entry of the Bidding Procedures Order.  The material terms of the Bidding Procedures are as follows:[5]

(a)  **Qualification as Bidder**: To participate in the bidding process or the Auction, a person or entity interested in acquiring the Equity Interests (each, a "Potential Bidder") must first deliver the following materials to the Debtor and its advisors: (A) an executed confidentiality agreement in form and substance satisfactory to the Debtor and its advisors (the "Confidentiality Agreement"); and (B) written evidence that enables the Debtor and its advisors, with the consent of the Committee, to reasonably determine whether a Potential Bidder has the financial, operational, and other ability to close the proposed transaction for the purchase of the Equity Interests (the "Proposed Transaction").

(b)  **Due Diligence**: Any Potential Bidder wishing to conduct due diligence concerning the Proposed Transaction shall be granted (i) reasonable access to the Debtor's management during normal business hours and (ii) access to all relevant information regarding the business of the Debtor reasonably necessary to enable a Potential Bidder to evaluate the Proposed Transaction.

(c)  **Bid Deadline**: Any Potential Bidder interested in the Proposed Transaction must submit a Bid prior to **June 19, 2015 at 4:00 p.m. (Houston Time)** (the "Bid Deadline") via email to: (1) BPZ Resources, Inc., the Debtor, attn: J. Durkin Ledgard, E-mail: durkin_ledgard@bpzresources.com; (2) Houlihan, as investment banker for the Debtor, attn: John-Paul Hanson, E-mail: jhanson@HL.com; (3) Stroock & Stroock & Lavan LLP, as co-counsel for the Debtor, attn: Matthew G. Garofalo, Esq., E-mail: mgarofalo@stroock.com and Hawash Meade Gaston Neese & Cicack LLP, as co-counsel for the Debtor, attn: Walter Cicack, Esq., E-mail: wcicack@hmgnc.com; and (4) Akin Gump Strauss Hauer & Feld LLP, as counsel to the Committee, attn: Michael S. Stamer and Meredith A. Lahaie, E-mail: mstamer@AkinGump.com and mlahaie@akingump.com; provided that if

---

[5]  Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order. To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order shall control.

the Debtor receives a Bid prior to the Bid Deadline that is not a Qualified Bid the Debtor may provide the Bidder with the opportunity to remedy any deficiencies prior to the Auction.

(d)     **Bid Requirements**:  A Bid will be considered a "<u>Qualified Bid</u>" only if the Bid satisfies the following requirements prior to the Bid Deadline:

      i.     Provides for the acquisition of the Equity Interests pursuant to an executed purchase and sale agreement (a "<u>Purchase and Sale Agreement</u>") that contains terms no less favorable to the Debtor's estate than the Form PSA (as defined below), as determined by the Debtor, with the consent of the Committee; <u>provided</u>, <u>however</u>, that the Debtor, with the consent of the Committee, may consider an executed Purchase and Sale Agreement that provides for the purchase of other assets of the Company, so long as such Purchase and Sale Agreement otherwise satisfies the other requirements set forth below;

      ii.     Provides that the Bid shall remain irrevocable until thirty (30) days after the Sale Hearing, <u>provided,</u> that if such Bid is accepted as the Successful Bid or the Backup Bid (each, as defined below), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures;

      iii.     Includes written evidence that the Debtor concludes, with the consent of the Committee, that the Qualified Bidder has demonstrated the necessary financial ability to close the Proposed Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Proposed Transaction (if any);

      iv.     Includes written evidence that such Qualified Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the execution of the agreements associated therewith, or a representation that no such authorization or approval is required;

      v.     Provides that any cash portion of the purchase price will be paid in cash, cash equivalents, or such other consideration acceptable to the Debtor;

      vi.     Be accompanied by wire transfer of immediately available funds, in the form of cash or a letter of credit, to an escrow agent designated by the Debtor before the Bid Deadline of an earnest money cash deposit of not less than ten percent (10%) of the purchase price contained in the Bid (the "<u>Good Faith Deposit</u>");

      vii.     Includes a proposed path and timeline reasonably satisfactory to the Debtor, with the consent of the Committee, that exhibits the Qualified

Bidder is reasonably likely to obtain prompt regulatory approval to consummate the Proposed Transaction;

viii.   Is submitted in the form of a legally binding Purchase and Sale Agreement, fully executed by the Qualified Bidder in a clean copy, together with redlined copy marked against the Form PSA, that further:

(1)   Identifies the Qualified Bidder and any members of its investor group, if applicable, and full disclosure of any parent companies of the Qualified Bidder;

(2)   Identifies with specificity the Equity Interests being purchased, the liabilities being assumed and any contracts and leases the Qualified Bidder seeks to have assigned (if any);

(3)   Identifies all conditions to the Qualified Bidder's obligation to consummate the Proposed Transaction;

(4)   Is not subject to any conditions, representations, or terms that the Debtor determines to be unacceptable;

(5)   Describes with specificity the total consideration proposed to be paid for the Equity Interests;

(6)   Is not conditioned upon the Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment;

(7)   Is not conditioned upon tax, due diligence, financing or other contingency;

(8)   Does not contain any condition to closing of the Proposed Transaction relating to the receipt of any third party approvals (excluding required Court approval);

(9)   Expressly acknowledges and represents that the Qualified Bidder: (A) has had an opportunity to conduct any and all due diligence regarding the Proposed Transaction prior to making its Bid, (B) has relied solely upon its own independent review, investigation and/or inspection of any documents in making its Bid or that of any of its legal, financial or other advisors, (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Company or the Proposed Transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Purchase and Sale Agreement ultimately accepted and executed by the Debtor, and (D)

15

accepts and consents to the Bidding Procedures and acknowledges the Court's exclusive jurisdiction to resolve issues related thereto;

(10) Sets forth the anticipated timeframe for consummating the Proposed Transaction; and

(11) Contains other information reasonably requested by the Debtor and its advisors.

(e)   **No Auction**: If only one Qualified Bid is received by the Debtor by the Bid Deadline, the Debtor shall not hold an Auction and such Qualified Bid shall be the Successful Bid.  If no Qualified Bid is received by the Debtor by the Bid Deadline, the Debtor shall not hold an Auction and shall not request approval of a sale of the Equity Interests at the Sale Hearing.

(f)   **Initial Highest Bid**: Prior to the Auction, the Debtor shall determine, in consultation with the advisors to the Committee, which Qualified Bid represents the then-highest or otherwise best bid (the "Initial Highest Bid" and the entity submitting such Bid, the "Initial Highest Bidder").  At least one business day prior to the Auction, each Qualified Bidder that timely submitted a Qualified Bid will be advised of such Initial Highest Bid and the Debtor shall distribute copies of such Initial Highest Bid to other Qualified Bidders.

(g)   **Auction**: If two or more Qualified Bids have been submitted for the Equity Interests in accordance with the Bidding Procedures, the Debtor is authorized to conduct an Auction on **June 23, 2015 at 10:00a.m. (Houston Time)** with respect to such Qualified Bids in order to determine the highest and best Bid (the "Successful Bid") to submit for approval by the Court.  The Auction shall be organized and conducted by the Debtor at the offices of Baker & Hostetler LLP, 811 Main Street, Suite 1100, Houston, Texas 77002, or such other location as may be announced prior to the Auction to the Auction Participants (defined below).

The Auction will be governed by the following procedures:

   i.   The only persons or entities who will be permitted to Bid at the Auction are the authorized representatives of each Qualified Bidder[6] (the "Auction Participants").  While only the Auction Participants may make Qualified Bids at the Auction, the Auction may be attended by representatives of the Debtor, the Committee and the U.S. Trustee.

   ii.  Each Qualified Bidder participating at the Auction will be required to represent that it has not engaged in any collusion with respect to the bidding or the Proposed Transaction.

---

[6]   Parties that have submitted bids for the Company's assets, which were determined to be "Qualified Bids" by the Debtor, shall be deemed to be "Qualified Bidders" for purposes of the Bidding Procedures.

iii.     The Auction shall be conducted by the Debtor in accordance with such procedures and requirements as may be established at the discretion of the Debtor and its advisors, with the consent of the Committee, to result in the highest and best offer for the Equity Interests, which rules shall be announced prior to commencement of the Auction and may include the determination of the amount of time between Qualified Bids, the conducting of multiple rounds of open bidding, and to declare that the Auction has ended when no further Bids are timely made or otherwise. The Debtor may waive and/or employ and announce at the Auction additional rules that are reasonable under the circumstances for conducting the Auction provided that such rules are (i) not inconsistent with the Bidding Procedures Order, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules of the Court, or any order of the Court entered in connection with this Chapter 11 Case and (ii) disclosed to each Qualified Bidder.

iv.     The first Qualified Bid at the Auction shall be deemed to have been made by the Initial Highest Bidder in the amount of the Initial Highest Bid. Thereafter, the Auction will continue in the manner determined by the Debtor above; provided, however, (i) additional Bids must be Qualified Bids (except that subsequent Qualified Bids made at the Auction, need not be received by the Bid Deadline) and (ii) additional Qualified Bids must be made in higher increments of at least $500,000 in cash (the "Minimum Bid Increment"). Each such additional Qualified Bid, shall be referred to herein as an "Overbid".

v.     The Debtor shall determine, with the consent of the Committee, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

vi.     The Auction shall continue until there is one Qualified Bid for the Equity Interests that the Debtor determines, after consultation with the advisors to the Committee, is the highest or best Qualified Bid at the Auction.  At the conclusion of the Auction, the Debtor shall: (i) select the highest and best offer for the Equity Interests (the "Successful Bid"); (ii) notify the person that made the Successful Bid (the "Successful Bidder") that such person's offer has been determined by the Debtor to be the Successful Bid, subject only to Court approval; and (iii) file a notice with the Court announcing the Successful Bidder and the Sale Hearing.  The Sale Hearing shall be held on **June 25, 2015**, or such other date as the Court may set.  Prior to the Sale Hearing, the Successful Bidder shall complete and sign all agreements and documents as necessary to bind the Successful Bidder to all of the terms and conditions contemplated by the Successful Bid.

vii.     The Good Faith Deposit of the Successful Bidder shall be applied by the Debtor against the purchase price to be paid by the Successful Bidder or held by the Debtor and forfeited, as the case may be, in accordance with

17

the terms of the Purchase and Sale Agreement associated with the Successful Bid.

viii. The Debtor shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Debtor's acceptance thereof have been authorized by order of the Court.

(h) **Good Faith Deposits**: The Good Faith Deposits of all Qualified Bidders shall be held in one or more accounts by the Debtor, but shall not become property of the Debtor's estate absent further order of the Court. The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder on the date that is the earlier of 72 hours after (a) the closing of the transaction with the Successful Bidder for the assets bid upon by the Backup Bidder and (b) the Outside Backup Date (as defined below). If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards the purchase price.

(i) **Backup Bidder**: Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Debtor, after consulting with the advisors to the Committee, will be designated as the backup bidder (the "Backup Bidder"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final Overbid) (the "Backup Bid") open and irrevocable until the earlier of (i) 4:00 p.m. (Houston Time) on the date that is thirty (30) days after the date of entry of the Sale Order (the "Outside Backup Date"), or (ii) the closing of the transaction with the Successful Bidder.

Following the Sale Hearing, if the Successful Bidder fails to consummate the Proposed Transaction, the Backup Bidder will be deemed to have the new prevailing bid, and the Debtor will be authorized, without further order of the Court, to consummate the transaction with the Backup Bidder. In such case of a breach or failure to perform on the part of such Successful Bidder, the defaulting Successful Bidder's deposit shall be forfeited to the Debtor. The Debtor reserves the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

(j) **Reservation of Rights**: The Debtor further reserves the right, as it may reasonably determine to be in the best interest of its estate, to: (1) determine which bidders are Qualified Bidders; (2) determine which Bids are Qualified Bids; (3) determine which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; (4) reject any Bid that is (A) inadequate or insufficient, (B) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (C) contrary to the best

18

interests of the Debtor and its estate; (5) waive terms and conditions set forth herein with respect to all Potential Bidders; (6) impose additional terms and conditions with respect to all Potential Bidders; (7) extend the deadlines set forth herein; (8) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (9) modify the Bidding Procedures and implement additional procedural rules that the Debtor determines, in its business judgment, will better promote the goals of the bidding process and discharge the Debtor's fiduciary duties and are not inconsistent with any Court order.

33.     Because the Company conducts most of its operations through various subsidiaries, the majority of the contracts required to operate the business are with the Debtor's subsidiaries. Accordingly, the Debtor does not anticipate a need to assume or assign any executory contracts. However, to the extent that the Successful Bidder requires that the Debtor assume and assign any contract, the Debtor reserves the right to request the assumption and assignment of such contracts at a later time.

D.   *The Form of Asset Purchase Agreement*

34.     Although there is no stalking horse bidder, the Debtor has prepared a form Equity Interest Purchase and Sale Agreement ("Form PSA"), a copy of which is attached hereto as **Exhibit B**, pursuant to which a purchaser would acquire the Equity Interests, consisting of the equity interests in the non-debtor subsidiaries BPZ Energy U.S. Holdings L.L.C. ("BPZ US Holdings") and BPZ Energy International Holdings, L.P. ("BPZ International Holdings"). The Debtor has determined that distributing the Form PSA to interested parties provides the best available platform for conducting an auction with respect to the Equity Interests. Notwithstanding the structure of the Form PSA as a purchase and sale agreement for the Equity Interests, the Debtor proposes to accept bids for any combination of the Company's assets. Accordingly, the procedures discussed more fully above contemplate that interested purchasers will submit an executed Purchase and Sale Agreement reflecting any changes from the Form PSA.

E.   *Notice*

35.     The Debtor proposes to give notice, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order (the "Sale Notice"), within one business day following entry of the Bidding Procedures Order, of the Bidding Procedures, the time and place of the Auction, the Sale Hearing, and the Objection Deadline (defined below).  The Debtor further proposes to give notice of the Sale Hearing and the Objection Deadline by sending the Sale Notice to: (i) all entities contacted by Houlihan or known by the Debtor to have expressed an interest in a transaction with respect to the Equity Interests during the past six (6) months prior to the entry of the Bidding Procedures Order; (ii) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (iii) all of the Debtor's insurers; (iv) all non-debtor parties to relevant contracts or leases (executory or otherwise) with the Debtor, if any; (v) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Equity Interests; and (vi) upon all parties set forth in the Debtor's Master Service List maintained in accordance with this Court's *Order Establishing Notice Procedures* [Dkt. No. 28] (to the extent any party to receive notice thereby has not received notice pursuant to sections (i) through (v) above) (collectively, the "Sale Notice Parties").  In addition, the Debtor shall post the information contained in this section on the website for the Debtor's noticing agent, Kurtzman Carson Consultants LLC.

F.   *Objections*

36.     All objections to the Sale or any relief requested in this Motion, other than the relief granted by this Court in the Bidding Procedures Order, must be: (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules; (d) filed with the Clerk of the Bankruptcy Court, 515 Rusk Avenue, Houston,

Texas 77002 by no later than **4:00 p.m. (Houston Time)** on the date that is one day prior to the

Sale Hearing (the "Objection Deadline"); and (e) served in accordance with the Local Rules so

as to be received on or before the Objection Deadline by the following: (i) co-counsel for the

Debtor: Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn:

Matthew G. Garofalo, Esq.) and Hawash Meade Gaston Neese & Cicack LLP, 2118 Smith

Street, Houston, Texas 77002 (Attn: Walter Cicack, Esq.); (ii) counsel to the Committee: Akin

Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, NY

10036 (Attn: Michael S. Stamer and Meredith A. Lahaie); and (iii) U.S. Trustee: 515 Rusk

Avenue, Suite 3516, Houston, Texas 77002 (Attn: Hector Duran).  Each objection shall state the

legal and factual basis of such objection and may be orally supplemented at the Sale Hearing.

## RELIEF REQUESTED

37.     By this Motion, the Debtor respectfully requests:

(i) approval of the Bidding Procedures and the form and manner of the Sale Notice that
will govern the expedited sale of the Equity Interests;

(ii) approval of the Turbine Asset Purchase; and

(iii) that this Court schedule a hearing to approve the Sale of the Purchased Assets to the
Successful Bidder.

## BASIS FOR RELIEF

**I.     The Bidding Procedures are Appropriate Under the Circumstances**

*A.   The Bidding Procedures Are Reasonable, Appropriate and Will Maximize
Value*

38.     A debtor may sell, after notice and a hearing, its assets outside the ordinary course

of business. 11 U.S.C. § 363.  As a general matter, to obtain approval of a proposed sale of

assets, a debtor must demonstrate that the tendered purchase price is the highest and best offer

under the circumstances of the case. *See, e.g.*, *Four B. Corp. v. Food Barn Stores, Inc. (In re*

*Food Barn Stores, Inc.*), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.*), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

39.     The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.   The Debtor submits that the foregoing Bidding Procedures and the opportunity for competitive bidding embodied therein are reasonable and designed to maximize the value of the Debtor's estate and should, therefore, be approved by this Court.

40.     Given the Debtor's liquidity position, lack of postpetition financing and the default asserted under the JOA, the Debtor believes that a prompt sale process is the best way to maximize the value of its assets for the benefit of its estate, creditors and other stakeholders.   To this end, the Debtor has developed the Bidding Procedures, which will give the Debtor an opportunity to consider competing bids and select the highest and best offer for the Equity Interests.   Specifically, the Debtor can receive bids for the Equity Interests, as well as bids for the Company's other assets, which allows the Debtor to consider different structures for the Sale and select that which will provide an optimal result for the Debtor's estate.   The Debtor submits that the Bidding Procedures and Auction will promote active bidding from seriously interested parties, which will increase the likelihood that the Debtor will receive the best possible consideration for the Equity Interests.   Additionally, the Bidding Procedures will allow the

22

Debtor to conduct an Auction in a fair and open fashion that will encourage participation by financially capable bidders that have the ability to close on the Sale.

41.      Accordingly, in the exercise of its reasonable business judgment, the Debtor has concluded that: (a) a prompt sale of the Equity Interests is the best way to maximize value for its estate, and (b) the proposed Bidding Procedures described herein are the most effective method of obtaining the highest and best offer for the Equity Interests.

B.    _Notice of the Proposed Sale is Reasonable under the Circumstances_

42.      Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify creditors of the Sale, including a disclosure of the time and place of any auction, the terms and conditions of the sale, and the deadline for filing any objections.  The Debtor submits that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale, Bidding Procedures, Auction, and Sale Hearing to the Debtor's creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Company's assets.

43.      Accordingly, the Debtor respectfully requests the Court to approve the notice procedures set forth in this Motion, including the form and manner of service of the Sale Notice, and that no other or further notice of the Sale, Bidding Procedures, Auction or Sale Hearing is necessary or required.

II.      **Approval of the Sale of the Equity Interests is Appropriate and in the Best Interest of the Debtor's Estate**

A.    _Sale of the Equity Interests is a Product of the Debtor's Reasonable Business Judgment_

44.      Section 363(b)(1) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

23

estate." 11 U.S.C § 363(b).  Additionally, section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C § 105(a).

45.     Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely authorize sales of a debtor's assets if such sale is based upon the reasonable business judgment of the debtor. *See Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)).  Virtually all courts have held that approval of a proposed sale of substantially all of the assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession.  *See In re Abbotts Dairies of Pa.*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; . . . the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value."); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr.

W.D. Pa. 1991); *In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987*); In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

46.   In applying the "sound business reason" test, courts will typically consider various factors in determining whether to approve a sale under section 363 of the Bankruptcy Code, including: (1) whether a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) whether adequate and reasonable notice has been provided to interested persons; (3) whether the trustee has obtained a fair and reasonable price; and (4) whether the transaction has been proposed in good faith. *See In re Titusville Country Club*, 128 B.R. at 399; *Phoenix Steel Corp.*, 82 B.R. at 335-36; *see also Stephens Indus.*, 789 F.2d at 390; *In re Lionel Corp.*, 722 F.2d at 1071.  Additionally, courts have permitted a proposed sale of all or substantially all assets of a debtor outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 143; *In re Lionel Corp.*, 722 F.2d at 1063 (passim); *In re Equity Funding Corp. of America*, 492 F.2d 793, 794 (9th Cir. 1974) ("Other circuits have recognized the power of the bankruptcy court under Chapter X to authorize a sale of the Debtors' property under less than emergency conditions where such sale is necessary to avoid deterioration in the value of the assets").

47.     The Debtor submits that the decision to sell its assets to the Successful Bidder at the Auction, whether through the sale of the Equity Interests or through a sale of some other combination of such the Company's assets, meets the "sound business reason" test.  First, sound business purposes justify the Sale.  The Debtor believes that a prompt sale of the Equity Interests by auction presents the best opportunity to realize the maximum value of the estate's assets for distribution to creditors.  The Debtor further believes that because the Debtor has not made the April Cash Call—and will be unable to make any future Cash Calls—an immediate sale is necessary to preserve the value of the Company's assets.   Furthermore, any delay in consummating a Sale will likely erode any potential proceeds that could be realized for creditors from a Sale. *See In re Lionel Corp.*, 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most importantly perhaps, [is] whether the asset is increasing or decreasing in value").  As a result, the Debtor is requesting authority to sell the Equity Interests (or other assets) on an expedited timeframe.  The Debtor submits that a sale of the Equity Interests or some combination of the Company's assets will be the only path for the Debtor to monetize its assets (other than the Turbine Assets).

48.     The proposed procedures for Sale of the Equity Interests also meet the other factors of the "sound business reason" test.  As part of this Motion, the Debtor has sought to establish procedures for notice to creditors, other prospective bidders, and other parties in interest.  Under the circumstances of this Chapter 11 Case, the Debtor submits that the notice period proposed satisfies the requirements of the Bankruptcy Rules, including Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed Sale and for bidders to formulate and submit competing proposals.

49.     The Debtor also submits that the results of the Auction will be the product of good faith, arm's length negotiations with respect to the price and other terms of the sale of the Purchased Assets between the Debtor (either on behalf of itself or its non-debtor subsidiaries, as applicable) and the Successful Bidder at the conclusion of the Auction.[7]

50.     As set forth above, the Debtor has determined, in the exercise of its sound business judgment, that the sale of the Equity Interests to the highest and best bidder at the Auction is appropriate and in the best interest of its estate and creditors.  The sale of the Equity Interests at the Auction will afford the Debtor's estate an opportunity to maximize the recoveries to creditors.  Accordingly, the Debtor requests that the Court approve the Sale presented to the Court at the Sale Hearing and to authorize the Debtor to take corporate actions necessary to consummate such Sale.

B.    _Sale of the Debtor's Assets Should Be Free and Clear of Claims and Interests_

51.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

---

[7]     At the Sale Hearing the Debtor intends to demonstrate that the Successful Bidder should be entitled to the protections of section 363(m) of the Bankruptcy Code.

52.     Because Section 363(f) is written in the disjunctive, a debtor is authorized to sell property free and clear of liens and interest if any one of the five requirements is met. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

53.     The Debtor believes that, in the event of a Sale of the Equity Interests, one or more of the requirements of section 363(f) are satisfied with respect to the transfer of the such assets.   In particular, the Debtor submits that it has little to no secured debt and the Debtor believes that to the extent that any secured claims exist, such parties holding liens, claims or encumbrances on the Equity Interests will consent, or absent any objection to this Motion, will be deemed to have consented to, the Sale pursuant to section 363(f)(2) of the Bankruptcy Code. However, despite the transfer of the Equity Interests, the Debtor will ensure that it retains reasonable access to its books and records in order to continue administering this Chapter 11 Case.   Accordingly, the Debtor proposes that section 363(f) authorizes the transfer and conveyance of the Equity Interests free and clear of any such claims, interests, liabilities or liens.

III.     **The Debtor Should be Authorized to take the Necessary Corporate Actions to Purchase the Turbine Assets**

54.     Similar to those cases seeking approval for a sale outside of the ordinary course of business, courts apply the business judgment test when the debtor seeks to take other actions that are not in the ordinary course. *See In re Cont'l Air Lines, Inc.*, 780 F.2d at 1226 (applying section 363(b) business judgment test to debtor's proposal to use estate funds to enter into and satisfy lease obligations under leases not contemplated under section 365); *In re ASARCO LLC*, 650 F.3d 593 (5th Cir. 2011) (affirming application of section 363(b) business judgment test to

28

debtor's motion to reimburse qualified bidders that participated in an auction); *see also*, *In re Enron Corp.*, 335 B.R. 22, 29-30 (S.D.N.Y. 2005) (affirming application of section 363(b) business judgment test to debtors' application to retain counsel for their employees); *In re SW Boston Hotel Venture, LLC*, No. 10-14535-JNF, 2010 WL 3396863, at *4 (Bankr. D. Mass. Aug. 27, 2010) (applying business judgment standard to debtor's motion to approve lease of real property). Accordingly, approval of a debtor's actions that are outside the ordinary course of business require a finding by a bankruptcy court that a good business reason exists for granting such an action. *In re Lionel Corp.*, 722 F.2d at 1070. In that regard, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

55.     Here, the Debtor is seeking Court authority to purchase the Turbine Assets from its subsidiary. The Debtor submits that this relief meets the business judgment test. In connection with the Company's effort to develop its gas-to-power project, the Debtor incurred a portion of its outstanding debt to finance the purchase of the Turbine Assets by its subsidiary. However, under the current circumstances, it is unlikely that the Company will have the resources to develop this project. As such, it is prudent to return the Turbine Assets to the entity that incurred the obligations in connection with their purchase, the Debtor. The proposed Turbine Asset Purchase will allow the Debtor to consolidate its assets and maximize value for all creditors. Further, the repayment of the intercompany debt in exchange for the Turbine Assets will represent a fair price, which will be informed by recent transactions for similar units and the Company's marketing efforts with respect to the Turbine Assets.

IV.      **Waiver of Bankruptcy Rule 6004(h)**

56.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtor requests that any order approving the Successful Bidder's Purchase and Sale Agreement be effective immediately by providing that the 14-day stay under Bankruptcy Rule 6004(h) be waived.

57.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, courts have waived the 14-day stay period where there has been no objection to the procedure, or any objection has been overruled.  Moreover, courts have approved a waiver of the 14-day stay where the delay in effectuating the order would harm the estate. *See, e.g., In re Nature Leisure Times*, *LLC*, No. 06–41357, 2007 WL 4554276 at *3 (Bankr. E.D. Tex. Dec. 19, 2007) (eliminating the waiting period under Rule 6004(h) because exigent circumstances existed); *In re Perry Hollow Mgmt. Co., Inc.*, 297 F.3d 34, 41 (1st Cir. 2002) (affirming bankruptcy court's waiver of the stay where the sale price was reasonable, the buyer was ready to complete the sale the next day and there would be storage charges for the assets if there were a delay).  The Debtor submits that cause exists to justify a waiver of the 14-day stay under Bankruptcy Rule 6004(h), as promptly closing the Sale is of critical importance to the Debtor's estate.  The Debtor requests that the Sale Order be effective immediately by providing that the 14-day stay be waived.

## NOTICE

58.     Notice of this Motion has been provided to: (i) counsel to the Committee; (ii) the U.S. Trustee; (iii) the United States Securities and Exchange Commission; (iii) the Internal Revenue Service; and (iv) all parties that, as of the filing of this Motion, have requested notice in this Chapter 11 Case pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

WHEREFORE, the Debtor respectfully requests that this Court:

(1) enter an order substantially in the form of the Bidding Procedures Order attached hereto as **Exhibit A**;

(2) enter the Sale Order at the conclusion of the Sale Hearing, which order shall be filed with the Court prior to the Sale Hearing;

(3) authorize the Debtor to purchase the Turbine Assets; and

(4) grant such other and further relief as it deems just and proper.

**[Remainder of Page Left Intentionally Blank]**

Dated: June 8, 2015                    Respectfully submitted,

HAWASH MEADE GASTON NEESE & CICACK LLP

By:           */s/ Walter Cicack*
                  WALTER CICACK
                  Texas State Bar No. 04250535
                  2118 Smith Street
                  Houston, Texas  77002
                  Telephone: (713) 658-9001
                  Facsimile: (713) 658-9011

and

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen (admitted *pro hac vice*)
Frank A. Merola (admitted *pro hac vice*)
Matthew G. Garofalo (admitted *pro hac vice*)
180 Maiden Lane
New York, NY 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

ATTORNEYS FOR THE DEBTOR AND DEBTOR-IN-POSSESSION