## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BPZ Resources, Inc., | § | Case No.: 15-60016 (DRJ) |
| | § | |
| Debtor. | § | |

---

## AMENDED DISCLOSURE STATEMENT FOR PLAN OF LIQUIDATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

Dated:  September 25, 2015

**STROOCK & STROOCK & LAVAN LLP**      **HAWASH MEADE GASTON NEESE & CICACK LLP**
Kristopher M. Hansen                   WALTER J. CICACK
Frank A. Merola                        Texas State Bar No. 04250535
Matthew G. Garofalo                    2118 Smith Street
180 Maiden Lane                        Houston, Texas  77002
New York, NY 10038                     Telephone: (713) 658-9001
Telephone: (212) 806-5400              Facsimile: (713) 658-9011
Facsimile: (212) 806-6006

ATTORNEYS FOR THE DEBTOR AND DEBTOR-IN-POSSESSION

**PLEASE REVIEW THIS DOCUMENT FOR IMPORTANT INFORMATION REGARDING:**

* **Description of the Debtor**
* **Classification and Treatment of Claims and Interests**
* **Distribution to Holders of Allowed General Unsecured Claims**
* **Implementation and Execution of the Plan**
* **Treatment of Contracts and Leases and Procedures to Assert and Resolve Rejection Claims**

**A COPY OF THIS DISCLOSURE STATEMENT AND THE DEBTOR'S PLAN OF LIQUIDATION MAY BE: (I) OBTAINED FREE OF CHARGE FROM KURTZMAN CARSON CONSULTANT LLC'S DEDICATED WEBSITE RELATED TO THE DEBTOR'S CHAPTER 11 CASE (HTTP://WWW.KCCLLC.NET/BPZ); (II) INSPECTED DURING REGULAR BUSINESS HOURS AT THE OFFICE OF THE CLERK OF THE BANKRUPTCY COURT, UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, VICTORIA DIVISION, 515 RUSK AVENUE HOUSTON, TEXAS 77002; OR (III) VIEWED FOR A FEE AT THE COURT'S WEBSITE (HTTPS://ECF.TXSB.USCOURTS.GOV/).**

## TABLE OF CONTENTS

**Page**

1.   INTRODUCTION ................................................................................................................1

    1.1   Purpose of the Disclosure Statement .................................................................1
    1.2   Disclosure Statement Enclosures .......................................................................4
    1.3   Final Approval of the Disclosure Statement and Confirmation of the Plan ....4
    1.4   Voting Procedures and Voting Deadline ............................................................5
    1.5   Confirmation Hearing ........................................................................................6

2.   THE DEBTOR ...................................................................................................................6

    2.1   Debtor's History and Business ...........................................................................6
    2.2   Debtor's Pre-Petition Corporate Structure ........................................................8
    2.3   Debtor's Pre-Petition Capital Structure ............................................................9
    2.4   Tax Appeal .......................................................................................................10
    2.5   Events Leading to Chapter 11 ..........................................................................10

3.   ACTIVITIES DURING THE CASE ................................................................................12

    3.1   Continuation of Business; Stay of Litigation and Enforcement of Creditors' Rights ....12
    3.2   Parties In Interest and Advisors .......................................................................12
    3.3   First Day Orders ...............................................................................................13
    3.4   Orders Authorizing Continued Use of Existing Cash Management System .................13
    3.5   Record Date Order Establishing Procedures for Equity Security Transfers and Claiming Worthless Stock Deductions ......................................................14
    3.6   The DIP Financing Process ..............................................................................14
    3.7   The Sale Motion and Turbine Assets ...............................................................14
    3.8   Motion Related to the Assumption and Rejection of Leases ...........................16
    3.9   Motion to Extend the Exclusive Periods to File and Solicit Acceptances of a Chapter 11 Plan ...............................................................17
    3.10  Committee's Motion for an Order Directing the Examination of, and Production of Documents from, the Debtor ....................................................17
    3.11  Committee's Motion for an Order Directing the Examination of, and Production of Documents from, PRE ................................................................17
    3.12  The Key Employee Plans Motion .....................................................................17
    3.13  Claims Process and Bar Date ...........................................................................18

4.   SUMMARY OF THE PLAN ...........................................................................................18

    4.1   Purpose of the Plan ..........................................................................................18
    4.2   Classification of Classified Claims and Equity Interests under the Plan .......................18
    4.3   The Liquidating Trust ......................................................................................22
    4.4   Distributions .....................................................................................................25

4.5     Procedures Resolving Disputed Claims ..................................................................28
4.6     Vesting of Assets and Dissolution .........................................................................29
4.7     Reservation of Rights Regarding Causes of Actions and Coverage Claims .................29
4.8     Directors and Officers; Equity Interests; Professionals for the Debtor .......................30
4.9     Operations of the Debtor Between the Confirmation Date and the Effective Date.......31
4.10    Term of Injunctions or Stays...................................................................................31
4.11    Corporate Action .....................................................................................................31
4.12    Cancellation of Existing Agreements and Existing Equity Interests ............................31
4.13    Authorization of Plan-Related Documentation..........................................................32
4.14    Dissolution of Committee ........................................................................................32
4.15    Exemption from Certain Fees and Taxes ..................................................................32
4.16    Assumption and Rejection of Executory Contracts and Unexpired Leases .................32
4.17    Rejection Damages Claims ......................................................................................33
4.18    Indemnification Obligations ....................................................................................33
4.19    D&O Policies ..........................................................................................................33
4.20    Conditions Precedent to Confirmation and Consummation of the Plan .......................33
4.21    Compromise and Settlement of Claims, Equity Interests and Controversies ...............34
4.22    Limited Discharge of the Debtor and Injunction ......................................................34
4.23    Preservation of Causes of Action.............................................................................35
4.24    Releases by the Debtor............................................................................................35
4.25    Exculpation of Exculpated Parties ...........................................................................36
4.26    Limited Exculpation of Covered Persons .................................................................36
4.27    Immediate Binding Effect ........................................................................................36
4.28    Modification of the Plan ..........................................................................................37
4.29    Revocation or Withdrawal of the Plan .....................................................................37

5.      FEASIBILITY ........................................................................................................38

5.1     Financial Feasibility Analysis ..................................................................................38

6.      BEST INTERESTS OF CREDITORS AND ALTERNATIVES TO PLAN ......................38

6.1     Chapter 7 Liquidation .............................................................................................38
6.2     Alternative Plan(s) ..................................................................................................39

7.      RISK FACTORS ....................................................................................................39

7.1     Financial Information; Disclaimer ............................................................................39
7.2     Failure to Confirm Plan ..........................................................................................39
7.3     Nonconsensual Confirmation...................................................................................40
7.4     Certain Bankruptcy Considerations .........................................................................40
7.5     Delays of Confirmation or Effective Date ................................................................40
7.6     The Debtor May Object to Amount or Classification of a Claim...................................40
7.7     Estimation of Claims...............................................................................................41
7.8     The Full Escrow Amount May Not be Released to the Debtor .....................................41
7.9     The Turbine Assets and All Claims and Causes of Action Shall Be Liquidating Trust
        Assets .....................................................................................................................41

7.10    No Duty to Update .................................................................................................41

7.11    No Representations Outside This Disclosure Statement Are Authorized ....................42

7.12    No Legal Or Tax Advice Is Provided To You By This Disclosure Statement ..............42

8.       TAX CONSEQUENCES OF THE PLAN .........................................................................42

8.1    Federal Income Tax Consequences to Holders of Claims and Equity  Interests ...........43

8.2    Federal Income Tax Consequences to Debtor ...............................................................45

8.3    Consequences of the Liquidating Trust .........................................................................46

8.4    Consequences of the Disputed Claim Reserve ..............................................................47

9.       CONCLUSION...................................................................................................................48

1.    **INTRODUCTION.**

1.1    **Purpose of the Disclosure Statement.**

This disclosure statement (as amended, modified or supplemented, the "Disclosure Statement") has been filed by BPZ Resources, Inc. ("BPZ" or the "Debtor", and together with its direct and indirect subsidiaries, the "Company") pursuant to section 1125(b) of Title 11 of the United States Code (the "Bankruptcy Code") for the purpose of soliciting acceptances of the Debtor's Plan of Liquidation (the "Plan"). The Plan has been filed with the United States Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Bankruptcy Court") and the summaries of the Plan contained herein shall not be relied upon for any purpose other than to make a judgment with respect to, and determine how to vote on, the Plan. A copy of the Plan is attached hereto as **Exhibit A**. All capitalized terms used within this Disclosure Statement which are not defined herein have the meanings set forth in the attached Plan.

PLEASE NOTE THAT MUCH OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN TAKEN, IN WHOLE OR IN PART, FROM INFORMATION CONTAINED IN THE BOOKS AND RECORDS OF THE COMPANY AND PLEADINGS FILED BY THE DEBTOR. ALTHOUGH THE DEBTOR HAS ATTEMPTED TO BE ACCURATE IN ALL MATERIAL RESPECTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. STATEMENTS MADE IN THIS DISCLOSURE STATEMENT RELATING TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11.

NO REPRESENTATION CONCERNING THE DEBTOR OR THE VALUE OF THE DEBTOR'S ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE DEBTOR IS NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR INCONSISTENT WITH, INFORMATION CONTAINED HEREIN AND IN THE PLAN.

YOU ARE STRONGLY URGED TO CONSULT WITH YOUR FINANCIAL, LEGAL AND TAX ADVISORS TO UNDERSTAND FULLY THE PLAN AND DISCLOSURE STATEMENT. THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS GIVEN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED.

THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT, UNDER ANY CIRCUMSTANCE, IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE SUCH DATE.  THIS DISCLOSURE STATEMENT IS INTENDED, AMONG OTHER THINGS, TO SUMMARIZE THE PLAN AND MUST BE READ IN CONJUNCTION WITH THE PLAN AND ITS EXHIBITS.  IF ANY CONFLICTS EXIST BETWEEN THE PLAN AND DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

IF A HOLDER OF A CLAIM WISHES TO CHALLENGE A DISPUTED CLAIM FOR VOTING PURPOSES UNDER THE TABULATION RULES SET FORTH IN THE DISCLOSURE STATEMENT ORDER, SUCH ENTITY MUST FILE A MOTION, PURSUANT TO BANKRUPTCY RULE 3018(A), FOR AN ORDER TEMPORARILY ALLOWING SUCH CLAIM IN A DIFFERENT AMOUNT OR CLASSIFICATION FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN AND SERVE SUCH MOTION ON THE UNDERSIGNED COUNSEL TO THE DEBTOR AND COUNSEL TO THE COMMITTEE SO THAT IT IS RECEIVED NO LATER THAN **[____] P.M., HOUSTON TIME, ON [_____], 2015**.  UNLESS THE BANKRUPTCY COURT ORDERS OTHERWISE, SUCH CLAIM WILL NOT BE COUNTED FOR VOTING PURPOSES IN EXCESS OF THE AMOUNT DETERMINED IN ACCORDANCE WITH THE TABULATION RULES.

**THE DEBTOR URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO <u>ACCEPT</u> THE PLAN.**

<u>**TREATMENT AND CLASSIFICATION OF CLAIMS AND INTERESTS; IMPAIRMENT**</u>

The following table classifies the Claims against, and Equity Interests in, the Debtor into separate Classes and summarizes the treatment of each Class under the Plan. The table also identifies which Classes are entitled to vote on the Plan based on provisions of the Bankruptcy Code.  Finally, the table indicates the estimated recovery for each Class.  The summaries in this table are qualified in their entirety by the description and the treatment of such Claims and Equity Interests in the Plan.  **The recoveries and estimates described in the following table represent the Debtor's best estimates given the information available on the date of this Disclosure Statement.  All statements in this section relating to the amount of Claims are only estimates based on information known to the Debtor as of the date hereof, and the final amounts of Allowed Claims may vary significantly from these estimates.**

-2-

| Class & Description | Treatment | Entitled to Vote | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Administrative Claims | Unimpaired; shall receive payment in full, in Cash, of the allowed amount of such Claim (or as otherwise agreed).<br><br>Estimated Allowed Claims:<br>$11,000,000.00 - $15,000,000.00 | No | 100% |
| Priority Tax Claims | Unimpaired; shall receive payment in full, in Cash, to the extent and in the manners allowed by section 1129 of the Bankruptcy Code (or as otherwise agreed).<br><br>Estimated Allowed Claims: $20,000.00 | No | 100% |
| Class 1: Priority Non-Tax Claims | Unimpaired; shall receive payment in full, in Cash, of the allowed amount of such Claim (or as otherwise agreed).<br><br>Estimated Allowed Claims: $29,000.00 | No | 100% |
| Class 2: Secured Claims | Unimpaired; shall receive payment in full, in Cash, of the allowed amount of such Claim (or as otherwise agreed), or return of the collateral.<br><br>Estimated Allowed Claims: $0.00 | No | 100% |
| Class 3: General Unsecured Claims | Impaired; shall receive Pro Rata Share of the Liquidating Trust Interests, or may make the Convenience Election to receive a one-time payment in Cash of twenty percent (20%) of the Allowed amount of such Claim.<br><br>Estimated Allowed Claims:<br>$227,000,000.00 - $229,000,000.00 | Yes | 10.7% - 18.0% |
| Class 4: Subordinated Claims | Impaired; shall receive no Distribution. | No | 0% |
| Class 5: Equity Interests | Impaired; shall receive no Distribution. | No | 0% |
| Class 6: Intercompany Claims | Impaired; shall receive no Distribution. | No | 0% |

**1.2**     **Disclosure Statement Enclosures.**

    **1.2.1**     **Disclosure Statement Approval Order**.  A copy of the order of the Bankruptcy Court dated [_____], 2015, conditionally approving this Disclosure Statement and, among other things, establishing procedures for voting on the Plan, setting the deadline for objecting to the Disclosure Statement and the Plan, and scheduling a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing") [Dkt. No. __].

    **1.2.2**     **Notice of Confirmation Hearing**.  A copy of the notice of deadline for submitting ballots to accept or reject the Plan (each, a "Ballot") and, among other things, the date, time and place of the Confirmation Hearing, and the deadline for filing objections to the Disclosure Statement or confirmation of the Plan (the "Notice").

    **1.2.3**     **Ballots**.  A Ballot for voting to accept or reject the Plan, if you are the Holder of a Claim in a voting Class as of the first date of the hearing to consider the Disclosure Statement Approval Order.

**1.3**     **Final Approval of the Disclosure Statement and Confirmation of the Plan.**

    **1.3.1**     **Requirements.**  The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.  The requirements for the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

    **1.3.2**     **Approval of the Plan and Confirmation Hearing.**  To confirm the Plan, the Bankruptcy Court must hold the Confirmation Hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

    **1.3.3**     **Effect of Confirmation.**  Except as otherwise provided in the Plan or in the Confirmation Order, confirmation will affect the Distribution of the Debtor's remaining assets and the dissolution of the Debtor.  Confirmation serves to make the Plan binding upon the Debtor, all Creditors, holders of Equity Interest and other parties-in-interest, regardless of whether they cast a Ballot to accept or reject the Plan.

    **1.3.4**     **Impaired Claims or Equity Interests.**  Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "Impaired" by the Plan and receiving a payment or distribution under the Plan may vote on the Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims or Equity Interests may be "Impaired" if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Equity Interests treated in such Class.

    The Holders of Claims not Impaired by the Plan (Class 1 – Priority Non-Tax Claims, and Class 2 – Secured Claims) are deemed to accept the Plan and do not have the right to vote on the Plan.

    The Holders of Claims Impaired by the Plan (Class 3 – General Unsecured Claims) are entitled to vote to accept or reject the Plan.

-4-

The Holders of Claims or Equity Interests in any Class that will not receive any payment or distribution or retain any property pursuant to the Plan (Class 4 – Subordinated Claims, Class 5 – Equity Interests and Class 6 – Intercompany Claims) are deemed to reject the Plan and do not have the right to vote on the Plan.

**1.4**     **Voting Procedures and Voting Deadline**.

1.4.1   **Eligibility to Vote on the Plan.**   Unless otherwise ordered by the Bankruptcy Court, only record holders of Allowed Class 3 Claims may vote on the Plan.

1.4.2   **Voting Deadline and Voting Instructions.**   If you are the Holder of an Allowed Claim in Class 3 – General Unsecured Claim you are entitled to vote to accept or reject the Plan and a Ballot is enclosed for the purpose of voting on the Plan.  To ensure your vote is counted you must (i) complete the Ballot, (ii) indicate your decision either to accept or reject the Plan in the boxes provided in Item 1 of the Ballot, and (iii) sign and return the Ballot to the address set forth on the Ballot (please note that envelopes and prepaid postage have been included with the Ballot).

Separate forms of Ballots are provided for the holders of Claims in different Classes entitled to vote on the Plan. **A separate Ballot must be used for each Class**. Any person who holds Claims in more than one Class entitled to vote is required to submit a separate Ballot for its Claims in each Class.  Except as provided below, holders of Claims are required to vote all of their Claims within a Class either to accept or reject the Plan and may not split their votes.  Any Ballot received that does not indicate either an acceptance or rejection of the Plan or that indicates both acceptance and rejection of the Plan will be an invalid Ballot and will not be counted.  Any Ballot received that is not signed or that contains insufficient information to permit the identification of the holder will be an invalid Ballot and will not be counted.

TO BE COUNTED, YOUR BALLOT WITH YOUR ORIGINAL SIGNATURE INDICATING YOUR ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE BALLOTING AGENT NO LATER THAN [___] **P.M. (HOUSTON TIME) ON [_____], 2015** (THE "VOTING DEADLINE").  **BALLOTS SENT BY FACSIMILE, EMAIL, OR OTHER ELECTRONIC TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

IF YOU ARE A HOLDER OF THE CONVERTIBLE NOTES, YOU MUST MAIL YOUR ORIGINAL, SIGNED BALLOT EITHER (I) TO THE NOMINEE THAT PROVIDED THE BALLOT TO YOU, IN SUFFICIENT TIME TO PERMIT YOUR NOMINEE TO DELIVER A MASTER BALLOT INCLUDING YOUR VOTE TO THE BALLOTING AGENT SO IT IS ACTUALLY RECEIVED ON OR BEFORE THE VOTING DEADLINE, OR (II) TO THE BALLOTING AGENT DIRECTLY, IF YOUR BALLOT HAS BEEN PRE-VALIDATED OR IF YOU ARE A RECORD HOLDER BY THE VOTING DEADLINE.

More detailed instructions regarding how to vote on the Plan are contained on the Ballots and the other solicitation materials.

1.4.3 **Acceptance of the Plan.** As a Creditor in an Impaired Class, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. At least one voting Class, excluding the votes of insiders, must actually vote to accept the Plan. **IF YOU ARE IN A VOTING CLASS AND YOU RECEIVED A BALLOT, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT IN THE ENVELOPE PROVIDED OR TO THE ADDRESS INDICATED ON THE BALLOT. IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED BY THE BALLOTING AGENT BY VOTING DEADLINE. IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT THE BALLOTING AGENT, KURTZMAN CARSON CONSULTANTS LLC, AT (877) 833-4150 FOR CALLS ORIGINATING FROM THE UNITED STATES OR CANADA, OR (917) 281-4800 FOR CALLS ORIGINATING FROM OUTSIDE OF THE UNITED STATES OR CANADA.**

**PLEASE NOTE THAT ANY RETURNED BALLOT THAT FAILS TO INDICATE ACCEPTANCE OR REJECTION OF THE PLAN OR IS NOT SIGNED WILL BE AN INVALID BALLOT AND WILL NOT BE COUNTED FOR VOTING PURPOSES.**

**THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN REPRESENTS THE BEST OPPORTUNITY TO MAXIMIZE VALUE FOR ALL OF ITS STAKEHOLDERS AND STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

**1.5    Confirmation Hearing**.

The Bankruptcy Court has scheduled the Confirmation Hearing on [_____], 2015 at [_____] (Houston Time) before the Honorable David R. Jones, United States Bankruptcy Judge, in the United States Bankruptcy Court, Room 400, 515 Rusk Avenue, Houston, Texas, 77002. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

**2.    THE DEBTOR.**

**2.1    Debtor's History and Business**.

(i)    General Background

The Debtor is a Texas corporation, which was incorporated in 2007, is headquartered in Houston, Texas, and maintains an office in Victoria, Texas. Through its non-debtor subsidiaries, the Debtor also maintained offices in Lima and Tumbes, Peru and Quito, Ecuador. Through its subsidiaries, BPZ was primarily engaged in the exploration, development and production of oil and natural gas in Peru.

The Debtor is a holding company and was the ultimate parent company of subsidiaries that engaged in the exploration, development and production of hydrocarbons. The Debtor

engaged in limited business operations in the United States, which were primarily technical, administrative and compliance related.

As of March 9, 2015, the date of the filing of this chapter 11 case (the "Petition Date"), and prior to the Sale Transactions (as defined below), the Company operated as follows:

(ii)    Peruvian License Contracts

The Company, through a former non-debtor subsidiary in Peru, BPZ Exploracion & Produccion, S.R.L. ("BPZ E&P"), had four license contracts for the exploration and production of hydrocarbons covering approximately 2.2 million acres in northwest Peru and in the coastal waters off the northwest coast of Peru.  The Company's license contracts covered four properties, referred to as "blocks".  Block Z-1 is located in the coastal waters off the northwest coast of Peru; Block XIX, Block XXII and Block XXIII (collectively, the "Onshore Blocks") are located onshore in northwestern Peru.  As described more fully below, the Company maintained a 51% working interest in Block Z-1 through a joint venture.  The Company maintained a 100% working interest in each of the Onshore Blocks.

(iii)    Block Z-1

BPZ's rights to explore and produce hydrocarbons in Block Z-1 were subject, generally, to the Peruvian hydrocarbon laws and specifically, to a license contract (the "Block Z-1 License") between BPZ E&P and Perupetro S.A. ("Perupetro"), a corporation owned by the Peruvian government empowered to enter into contracts for the exploration and/or exploitation of hydrocarbons in Peru.  The Block Z-1 License was signed in November 2001 and, among other things, required specified exploration obligations in defined time periods.  Commercial production in Block Z-1 commenced in 2010.  As described more fully below, BPZ provided a guaranty to Perupetro of the exploration obligation under the Block Z-1 License.  Block Z-1 was in the exploitation phase of the contract.

In April 2012, the Company executed a Stock Purchase Agreement (the "SPA") under which the Company formed an unincorporated joint venture with a subsidiary of Pacific Rubiales ("PRE") to explore and develop Block Z-1.  Pursuant to the SPA, PRE agreed to pay $150.0 million for a 49% participating interest, including reserves, in Block Z-1 and agreed to fund $185.0 million of the Company's share of capital and exploratory expenditures in Block Z-1 (the "Carry Amount") from the effective date of the SPA, January 1, 2012.  The Carry Amount PRE agreed to pay in connection with the joint venture was completed in December 2014 and thereafter BPZ was responsible for funding the full share of capital expenditures and joint operating expenditures for Block Z-1.

PRE provided certain technical and operating services to the joint venture, as set forth in a joint operating agreement between the parties (the "JOA").  Block Z-1 development was determined and supervised by a joint operating committee that included representatives from PRE and the Company.  Decisions regarding budgeting capital expenditures required unanimous consent between BPZ E&P and PRE.  Once certain capital expenditures were approved, the JOA required that each party fulfill its expenditure obligations or be subject to certain penalties.

-7-

Under the JOA, the operating costs and capital expenditures related to the operation and development of Block Z-1 were funded by "cash calls" on the parties to the joint venture that required satisfaction of each party's proportional share of costs and capital expenditures on a monthly basis.  Each partner had 15 days to satisfy a properly documented cash call.  To the extent a joint venture party did not timely satisfy a required cash call, such party would have been in default under the JOA.  BPZ E&P's obligations to make payments on account of cash calls under the JOA were historically funded by the Debtor and its subsidiaries.

Prior to the closing of the Sale Transactions, Block Z-1 was the Company's only revenue-producing property.  Block Z-1 had two producing oil fields, Corvina and Albacora.  Corvina had thirteen (13) producing oil wells operated off of two platforms.  Albacora had six (6) producing wells operated off of one platform. The daily production rates at both Corvina and Albacora were subject to fluctuation given the small number of wells in each field.  Production from the fields at Block Z-1 was transported by tanker to the Perupetro refinery in Talara, Peru.  Block Z-1 also contained non-producing prospects and leads that were under exploration.

(iv)     The Onshore Blocks

The rights to explore and produce hydrocarbons in the Onshore Blocks are similarly subject to Peruvian hydrocarbon laws. Specifically, the Onshore Blocks were subject to separate license contracts between the Company and Perupetro.  The Block XIX contract was signed in December 2003 and the Blocks XXII and XXIII contracts were signed in November 2007.  As of the closing of the Sale Transactions, the Onshore Blocks were in the exploration phase and were not producing revenue.

(v)      Ecuador Property

The Company, through SMC Ecuador, Inc. ("SMC Ecuador"), owned a 10% non-operating net profits interest with a consortium of investors in an oil and gas producing property located in the southwest region of Ecuador (the "Ecuador Property").  The block located at the Ecuador Property is operated by Pacifpetrol S.A.  Although the Ecuador Property was producing hydrocarbons, the Debtor did not expect to receive any significant revenue from the Ecuador Property.

**2.2     Debtor's Pre-Petition Corporate Structure**.

Prior to the Petition Date, the Debtor was the direct parent of its wholly-owned subsidiaries, BPZ U.S. Holdings, L.L.C. ("BPZ Holdings"), a Texas corporation, SMC Ecuador, a Delaware corporation, and BPZ Marine Inc., a Texas corporation.  BPZ also directly owned ninety percent (90%) of the outstanding equity interests in BPZ Energy International Holdings L.P. ("BPZ International"), a limited partnership organized and existing under the laws of the British Virgin Islands. BPZ Holdings directly owned ten percent (10%) of the outstanding interests in BPZ International.

BPZ International owned, directly, (a) one hundred percent of the outstanding limited liability company interests in BPZ Energy, L.L.C. ("BPZ Texas"), a limited liability company organized and existing under the laws of the State of Texas, (b) forty five percent (45%) of the

issued and outstanding equity interests in BPZ Exploracion & Produccion, S.R.L. ("BPZ E&P"), a sociedad de responsabilidad limitada organized and existing under the laws of Peru, (c) forty five percent (45%) of the issued and outstanding equity interests in BPZ Marine Peru S.R.L. ("BPZ Marine"), a sociedad de responsabilidad limitada organized and existing under the laws of Peru, (d) fifty percent (50%) of the outstanding equity interests in Empresa Electrica Nueva Esperanza, S.R.L. ("EENE"), a sociedad de responsabilidad limitada organized and existing under the laws of Peru and (e) ten percent (10%) of the interests in Soluciones Energeticas S.R.L. ("Soluciones Energeticas"), a sociedad de responsabilidad limitada organized and existing under the laws of Peru.

BPZ Texas owned (a) fifty-five percent (55%) of the outstanding equity interests in BPZ E&P, (b) fifty percent (50%) of the outstanding equity interests in EENE and (c) ninety percent (90%) of the outstanding equity interests in International Support, L.P., a limited partnership organized and existing under the laws of the British Virgin Islands, which in turn owns ninety percent (90%) of the interests in Soluciones Energeticas.  BPZ E&P owned fifty-five percent (55%) of the outstanding equity interests in BPZ Marine.

Upon the closing of the Sale Transactions (as defined below), which transactions closed on July 30, 2015 and July 31, 2015, the Debtor retained ownership of the following subsidiaries: (i) BPZ Holdings; (ii) BPZ Marine, Inc.; (iii) SMC Ecuador (including its branch in Ecuador, Sucursal Ecuador); (iv) BPZ International; (v) International Support LP; (vi) Soluciones Energeticas; (vii) BPZ Lote XIX S.R.L.; (viii) BPZ Lote XXII S.R.L.; (ix) BPZ Lote Z-1 S.R.L.; and (x) BPZ Z-1 OIL S.R.L.

On August 11, 2015, BPZ International entered into an agreement with Zorritos (as defined below), pursuant to which BPZ International agreed to sell BPZ Lote XIX S.R.L., BPZ Lote XXII S.R.L., BPZ Lote Z-1 S.R.L. and BPZ Z-1 OIL S.R.L.  The aggregate consideration for the sale of these subsidiaries consists of $25,000 in cash, which was paid.

### 2.3     Debtor's Pre-Petition Capital Structure.

2.3.1   **Equity**.  As of December 31, 2014, BPZ had approximately 118.7 million shares of common stock outstanding.  Additionally, BPZ issued stock options and restricted stock grants to certain senior-level executives and managers.  Until March 2015, BPZ was listed on the New York Stock Exchange ("NYSE").  On March 2, 2015, the NYSE notified BPZ that trading in BPZ's common stock would be suspended and that the NYSE would commence proceedings to delist BPZ's common stock.

As BPZ is a publicly traded company, its common equity is widely held.  The holders of more than 5% of BPZ's common stock (as of September 30, 2014) are reflected on Exhibit A to the Debtor's bankruptcy petition.

2.3.2   **6.5% Convertible Notes Due 2015**.  In February 2010, BPZ issued approximately $161 million in principal amount of 6.5% Convertible Notes due 2015 (the "2015 Notes"), pursuant to that certain Indenture among BPZ, as issuer, and Wells Fargo Bank, National Association ("Wells Fargo"), as indenture trustee.  Additional 2015 Notes were issued on March 12, 2010 in an amount of approximately $10 million.  The 2015 Notes are unsecured

and are not guaranteed by any of the Debtor's subsidiaries.  The scheduled maturity for the 2015 Notes was March 1, 2015, with a 10-day grace period with respect to payments to be made upon maturity.

In September 2013, following the issuance of the 2017 Notes (defined below), BPZ repurchased approximately $85 million in principal amount of the 2015 Notes.  In April 2014, BPZ retired approximately $26 million in principal amount of the 2015 Notes.  As of the Petition Date, approximately $59.9 million in principal amount was outstanding under the 2015 Notes.

The Debtor failed to make the payment of approximately $60 million in principal amount due on the 2015 Notes on March 1, 2015, or within the applicable grace period, and failed to timely cure that default.

2.3.3   **8.5% Convertible Notes Due 2017**.  In September 2013, BPZ issued, at a public offering price of 90%, approximately $143.8 million in principal amount of 8.5% Convertible Notes due 2017 (the "2017 Notes, and together with the 2015 Notes, the "Convertible Notes"), pursuant to that certain Indenture among BPZ, as issuer, and Wells Fargo, as indenture trustee.  In April 2014, in connection with the retirement of certain of the 2015 Notes, BPZ issued approximately $25 million in additional 2017 Notes.  The 2017 Notes are unsecured and are not guaranteed by any of the Debtor's subsidiaries.  The scheduled maturity for the 2017 Notes is October 1, 2017.  As of the Petition Date, approximately $168.7 million in principal amount was outstanding under the 2017 Notes.

2.3.4   **Parent Guaranty**.  Pursuant to the Block Z-1 License, BPZ provided a parent company guaranty (the "Parent Guaranty") of the exploration obligations of BPZ E&P thereunder.  Additionally, it was a requirement under the Block Z-1 License that the Parent Guaranty remain in place.  Subject to the terms and conditions of the Purchase and Sale Agreement (as defined below), Zedd Energy Holdco Ltd ("Zedd") (or a solvent parent company or affiliate of Zedd) will replace the Debtor as BPZ E&P's corporate guarantor under the Block Z-1 License.

2.3.5   **Trade Debt**. As a holding company, the Debtor does not have substantial trade creditors.  The operations of the Debtor are primarily technical, administrative and compliance in nature.  Accordingly, the majority of the Debtor's trade creditors include attorneys, accountants and other professionals, as well as vendors related to the Debtor's status as a public company.  As of the Petition Date, the Debtor estimates that only a *de minimis* amount of trade obligations of the Debtor is outstanding.

2.4   **Tax Appeal**.  The Company has an appeal pending with the Appeals Office of the U.S. Internal Revenue Service.  The appeal involves a dispute with respect to certain tax deductions made by BPZ International during the tax years ending December 31, 2009 through 2012.

2.5   **Events Leading to Chapter 11**.

The oil industry generally, and the Company in particular, was hit hard by the swift and drastic drop in crude oil prices.  With a March 2015 maturity looming under the 2015 Notes, the

-10-

decline in the oil market made traditional capital markets solutions unworkable.  In October 2014, BPZ began exploring possible strategic alternatives to address its financial situation and upcoming debt maturity for the 2015 Notes.  In connection with these efforts, BPZ retained Houlihan Lokey ("Houlihan") as financial advisor and investment banker and Stroock & Stroock & Lavan LLP ("Stroock"), as legal counsel.

2.5.1  **Third Party Process**.  In December 2014, Houlihan began its analysis of the Company's operations, historical financial results, prospective outlook and liquidity.  Houlihan, with the assistance of Stroock, the Company's management and the Special Committee of the Board of Directors ("Special Committee"), prepared materials for investors potentially interested in a transaction with the Company (the "Investor Materials").  On January 20, 2015, Houlihan launched its process to obtain capital from financial or strategic investors (the "Third Party Process").  In connection with the Third Party process, Houlihan contacted a targeted list of more than 60 potentially interested investors, including both domestic and international strategic and financial investors.  Seven of the parties contacted entered into non-disclosure agreements ("NDAs") with the Company to further explore a potential strategic transaction.  A virtual data room was established containing extensive information about the Company, including the Investor Materials and other information describing the Company's business and financial results.

2.5.2  **Noteholder Process.**  During the Third Party Process, the Special Committee, in consultation with BPZ's advisors, determined that Houlihan should also solicit proposals from an informal group of holders of the Convertible Notes (the "Ad Hoc Group").  Accordingly, in January 2015, Stroock and Houlihan entered into discussions with counsel and a financial advisor to the Ad Hoc Group (the "AHG Advisors").  Houlihan provided the AHG Advisors with access to a virtual data room and the Investor Materials, and, together with Stroock and the Company's management, met with the AHG Advisors regarding a potential restructuring.

In February 2015, the members of the Ad Hoc Group executed NDAs with the Company and received certain diligence information, including portions of the Investor Materials, in connection with a potential transaction.  Following the initial meeting, the Company's advisors worked closely with the AHG Advisors regarding a potential transaction.  Throughout February and early March of 2015, the Debtor and the Ad Hoc Group, and their respective advisors participated in several meetings and discussions both in person and telephonically. As of the Petition Date, the Debtor was still in negotiations with the Ad Hoc Group and the AHG Advisors regarding the terms of a potential restructuring. During such time, numerous term sheets were exchanged.  However, the parties were unable to reach an agreement.

2.5.3  **DIP Financing.**

During the pre-petition period, the Debtor also engaged in discussions with third parties regarding potential postpetition secured debtor-in-possession financing ("DIP Financing").  The Debtor was not able to agree on the terms of any DIP Financing or restructuring proposal prior to the Petition Date.  As a result of the approaching expiration on the grace period for the maturity

-11-

of the 2015 Notes, the Debtor's board determined that filing the Bankruptcy Case was the best way to preserve the value of the Debtor's estate and was in the best interest of all stakeholders.

**3.**     **ACTIVITIES DURING THE CASE**.

    **3.1**     **Continuation of Business; Stay of Litigation and Enforcement of Creditors' Rights**.

        3.1.1     **Continuation of Business and Remaining Subsidiaries**.   Since the Petition Date, the Debtor has continued to operate as debtor-in-possession subject to the supervision of the Bankruptcy Court.  Although the Debtor is authorized to operate in the ordinary course of business, transactions out of the ordinary course of business have required Bankruptcy Court approval.

        As of September 8, 2015, the Debtor retains the following subsidiaries: (i) BPZ Holdings; (ii) BPZ Marine; (iii) SMC Ecuador, Inc., (including its Ecuador branch, Sucursal Ecuador); (iv) BPZ International; (v) International Support LP; and (vi) Soluciones Energeticas.

        3.1.2     **Stay of Litigation and Enforcement of Creditors' Rights**.   An immediate effect of the Debtor's filing its voluntary chapter 11 petitions was the imposition of the automatic stay under the Bankruptcy Code, which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of liens against property of the Debtor and the continuation of litigation against the Debtor. The automatic stay of an act against property of the Debtor's estate remains in effect, unless modified by the Bankruptcy Court, until such property is no longer property of the Debtor's Estate; the stay of all other acts encompassed by the automatic stay continues until the earlier of the time the Debtor's case is closed or dismissed.

    **3.2**     **Parties In Interest and Advisors**.

        3.2.1     **The Bankruptcy Court**.  The Debtor's case was filed in the United States Bankruptcy Court for the Southern District of Texas, located in Victoria, Texas.  The Honorable David R. Jones, United States Bankruptcy Judge, is presiding over the Debtor's case.

        3.2.2     **Advisors to the Debtor**.  Pursuant to Court approval, the Debtor has retained (i) Stroock as bankruptcy counsel [Dkt. No. 82], (ii) Hawash Meade Gaston Neese & Cicack LLP, as local bankruptcy counsel [Dkt. Nos. 37, 115], (iii) Opportune LLP ("Opportune") as restructuring advisor [Dkt. No. 103], and (iv) Houlihan as financial advisor and investment banker [Dkt. No. 83].

        Opportune's retention was terminated by the Debtor, effective as of July 31, 2015. Houlihan's retention was terminated by the Debtor, effective as of August 6, 2015.

        3.2.3     **The Committee and Its Advisors**.  On April 14, 2015, the United States Trustee, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed the official committee of unsecured creditors (the "Committee") to serve in the Debtor's case.  The

Committee was appointed to represent the interests of, and to serve as a fiduciary for, the Debtor's unsecured creditors.

The members of the Committee are: Wells Fargo Bank, N.A., Indaba Capital Fund, L.P., Silverback Asset Management, L.L.C., Frederick T. Greene, and Robert C. Kinnear Jr. The Committee has employed Akin Gump Strauss Hauer & Feld LLP as legal counsel, which employment was approved by the Court on June 9, 2015 [Dkt. No. 188]. On June 29, 2015, the Committee filed an application to retain Blackstone Advisory Partners L.P. as its financial advisor, which initial application was denied by the Court without prejudice [Dkt. No. 234]. On August 18, 2015, the Committee filed an amended application to retain Blackstone Advisory Partners L.P. [Dkt. No. 292].

   3.2.4 **Wells Fargo Bank, N.A.**  Wells Fargo is the indenture trustee under the 2015 Notes and the 2017 Notes. Wells Fargo is also a member of the Committee.

  **3.3** **First Day Orders**. On March 10, 2015, the Bankruptcy Court entered a number of orders granting the Debtor various forms of interim and permanent relief, including, but not limited to, the following:

   3.3.1 **Order Granting Complex Chapter 11 Bankruptcy Case Treatment**. The Bankruptcy Court entered an order qualifying the Debtor's case as a complex chapter 11 case.

   3.3.2 **Order Authorizing Payment of Prepetition Employee Wages, Reimbursable Expenses, Employee Benefits and Other Compensation**.  The Bankruptcy Court approved an order (i) authorizing the Debtor to pay prepetition employee wages, salaries, reimbursable expenses, employee benefits and other obligations; (ii) directing all banks to honor certain related prepetition transfers; and (iii) granting related relief [Dkt. No. 30].

   3.3.3 **Order Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service**.  The Bankruptcy Court approved an interim order, and subsequently a final order, (i) prohibiting utility companies from altering, refusing or discontinuing service to the Debtor; (ii) deeming utility companies adequately assured of future payment; and (iii) establishing procedures for determining requests for additional adequate assurance [Dkt. Nos. 31, 86].

  **3.4** **Orders Authorizing Continued Use of Existing Cash Management System**. On March 11, 2015, the Bankruptcy Court approved an interim order authorizing, among other things, the Debtor's (i) maintenance of prepetition bank accounts and cash management system; (ii) continued use of business forms; (iii) continuation of current investment practices; and (iv) transfer to the accounts of non-debtor affiliates (each, an "Intercompany Transfer"), of funds limited to capital expenditures or operating expenditures necessary to satisfy a "cash call" pursuant to the JOA, in the aggregate amount of $11,000,000 [Dkt. No. 36]. On March 26, 2015, the Bankruptcy Court approved a second interim order, which authorized an additional Intercompany Transfer, limited to capital expenditures or operating expenditures necessary to satisfy a "cash call" pursuant to the JOA, in the aggregate amount of $6,000,000 [Dkt. No. 90]. On April 28, 2015, the Bankruptcy Court entered a final order authorizing the Debtor's (i)

maintenance of prepetition bank accounts and cash management system; (ii) continued use of business forms; (iii) continuation of current investment practices; and (iv) continuation of Intercompany Transfers subject to notice and objections by certain parties in interest [Dkt. No. 145].

**3.5     Record Date Order Establishing Procedures for Equity Security Transfers and Claiming Worthless Stock Deductions.**   On March 26, 2015, the Bankruptcy Court approved a record date order establishing, among other things: (i) the procedures for transfers of equity securities; and (ii) the procedures for claiming worthless stock deductions [Dkt. No. 89].

**3.6     The DIP Financing Process.**   Prior to the Petition Date, the Debtor explored strategic alternatives and financing options.  The Debtor and Houlihan launched a process to obtain capital from financial or strategic investors, and targeted more than 60 potentially interested investors, including both domestic and international strategic and financial investors. Simultaneously therewith, the Debtor began discussions with counsel and financial advisor the Ad Hoc Group.  The Debtor was unable to reach agreement with potential investors regarding a financing prior to the Petition Date.

Following the filing of the Bankruptcy Case, the Debtor and its advisors continued discussions and negotiations with both the Ad Hoc Group and third parties with the intent of finding the best available value-maximizing transaction or DIP Financing for the Debtor.  Faced with continuing cash calls under the JOA and depleting cash on hand, the Debtor, with the assistance of its advisors, furthered its efforts to solicit offers for postpetition financing. In seeking such financing, through its advisors, the Debtor contacted approximately thirty-five (35) parties, including alternative funding sources in addition to the Ad Hoc Group.  As a result of this process, the Debtor received non-binding proposals for DIP Financing from various parties, some of which contemplated that the proposed lender(s) would become a stalking horse bidder in the event of a sale of the Debtor's assets. The Debtor engaged in substantial negotiations with the various parties regarding the terms of potential financing.   These efforts resulted in the preparation and negotiation of numerous credit agreements and related documentation. However, after weeks of negotiations, the Debtor was ultimately unable to reach an agreement with any of the parties and determined, in its business judgment and in consultation with the Committee, to proceed with a sale process instead.

**3.7     The Sale Motion and Turbine Assets.**

3.7.1     **Sale Motion**.   On June 8, 2015, the Debtor filed the *Debtor's Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 and Bankruptcy Rules 2002 and 6004 for Orders (I) (A) Approving Bidding Procedures and Notice Procedures Related to the Proposed Sale of Assets and (B) Scheduling a Hearing on Approval of the Proposed Sale of Assets; (II) Approving the Sale of Assets Free and Clear of Claims and Liens; (III) Authorizing the Debtor to Take Certain Corporate Actions to Purchase the Turbine Assets and (IV) Granting Related Relief* (the "Sale Motion"), seeking approval of, among other things, the bidding procedures that would govern an expedited sale of the Debtor's assets (the "Bidding Procedures") and the process by which such a sale would be conducted [Dkt. No. 187].  The Sale Motion also sought

-14-

authorization for the Debtor to take actions to purchase three GE LM 6000 PD Sprint turbines owned by a non-debtor subsidiary (the "Turbine Assets").

The Bankruptcy Court entered an order, dated June 12, 2015, approving the Bidding Procedures as set forth in the Sale Motion, scheduling an auction (the "Auction"), and authorizing the Debtor to take any corporate action required to purchase the Turbine Assets [Dkt. No. 194] (the "Bidding Procedures Order").  Among other things, the Bidding Procedures included minimum bid increments to promote ease of bidding and to maximize the total potential value of the Debtor's assets.  The Bidding Procedures also provided for a backup bid to allow the Debtor to consummate a transaction with the backup bidder in the event that the successful bidder failed to consummate the transaction.

3.7.2   **Auction**.  The Debtor held the Auction on June 30-July 1, 2015, during which time the Debtor, the Committee, the Debtor's and the Committee's professionals continued to negotiate and engage qualified bidders in an effort to increase the offers.  As a result of these negotiations and the spirited bidding at the Auction, the Debtor received two separate proposals, which collectively amounted to a sale of substantially all of the equity interests the Debtor owned in its non-debtor subsidiaries.  Accordingly, at the conclusion of the Auction, the Debtor selected, in consultation with the Committee: (i) a purchase and sale agreement by and between the Debtor, as seller, and Zedd Energy Holdco Ltd., as purchaser (the "Purchase and Sale Agreement"), as the successful bid; and (ii) the purchase and sale agreement by and between the Debtor and Zorritos Peru Holdings Inc. ("Zorritos") (the "Spin-Off Contract").  The Purchase and Sale Agreement provided for a purchase price of $8,500,000 for the equity interests of the Debtor in its non-debtor subsidiaries.  The Spin-Off Contract provided for a purchase price of up to $1,000,000 for the purchase of, among other things, certain assets of the Debtor relating to the Onshore Blocks, all equity interests in the Company's power generation subsidiary EENE and, subject to Ecuadorian government approval and applicable rights of first refusal, all equity interests in SMC Ecuador, Inc. (the "Spin-Off Assets").  The purchase price in the Spin-Off Contract was subject to certain adjustments if the SMC Ecuador, Inc. equity interests were not acquired.

In accordance with the Bidding Procedures Order, the Debtor also selected, in consultation with the Committee, a bid from Zorritos, as the backup bid.

3.7.3   **Sale Order**.  On July 8, 2015, the Bankruptcy Court entered an order (the "Sale Order"), approving the sale of substantially all of the Debtor's assets pursuant to a series of transactions contemplated by the Purchase and Sale Agreement and the Spin-Off Contract (the "Sale Transactions") [Dkt. No. 239].

3.7.4   **Sale Transactions**.  On July 31, 2015, the Debtor completed the transactions contemplated by the Purchase and Sale Agreement, dated July 24, 2015, by and between the Company and Zedd, as amended by Amendment No. 1 to the Purchase Agreement, dated July 24, 2015 [Dkt. No. 262], pursuant to which the Debtor agreed to sell all of its equity interests in a new subsidiary holding company structure for its subsidiaries BPZ Texas, BPZ E&P and BPZ Marine.  The assets that remained with these entities after the sale included BPZ E&P's 51% working interest in the License Contract for offshore Block Z-1 in northwest Peru,

all of the Debtor's marine assets and any related assets. The aggregate consideration for the sale consisted of $8,500,000 in cash paid at closing.

In connection with the Sale Transaction contemplated by the Purchase and Sale Agreement, the Debtor and Zedd entered into the Escrow Agreement, dated July 24, 2015, by and among the Debtor, as seller, Zedd, as buyer, and Wells Fargo Bank, National Association, as escrow agent (the "Escrow Agreement"). Pursuant to the terms of the Escrow Agreement, the purchase price of $8,500,000 was placed into an escrow account to secure, among other things, certain indemnification obligations to Zedd and purchase price adjustments. The amounts held in such escrow account (the "Zedd Escrow Amount") are to be released to the Debtor in accordance with the terms of the Escrow Agreement.

On July 30, 2015, the Debtor completed the transactions contemplated by the Spin-Off Contract, pursuant to which the Debtor agreed to sell: (i) all of the rights and obligations of BPZ E&P, under the license contracts of the Onshore Blocks in northwestern Peru to Upland Oil & Gas, S.R.L., a qualified operator as defined under Peruvian law as designated by Zorritos; (ii) all cash and other collateral supporting any corporate or financial guarantees granted or issued by BPZ E&P with respect to the Onshore Block licenses; (iii) certain material and supplies of BPZ E&P related to the Onshore Block licenses; (iv) the intellectual property related to the Onshore Block Licenses; (v) all equity interests in the Debtor's power generation subsidiary EENE; and (vi) any other contracts, licenses, permits, orders and related rights relating solely to the ownership, operation or use of the assets. The aggregate consideration under the Spin-Off Contract received by the Debtor from Zorritos consisted of $750,000 in cash, paid at closing (adjusted from the original purchase price due to the exercise of the right of first refusal by the operator of the Santa Elena property in Ecuador to purchase all of SMC Ecuador's interest in the Santa Elena property).

In connection with the Spin-Off Contract, Zorritos placed the purchase price of $750,000 (the "Zorritos Escrow Amount") into an escrow account held by Seyfarth Shaw LLP, as escrow agent. The Zorritos Escrow Amount is to be released upon joint written instruction to the Seyfarth Shaw LLP from the Debtor and Zorritos to be provided upon receipt of final tax certification from the Peruvian tax authority, Superintendencia Nacional de Aduanas y de Administración Tributaria, which is expected in mid-September.

3.7.5    **Turbine Sale Transaction**. The Debtor currently owns the Turbine Assets and intends to sell the Turbine Assets in the near term (a "Turbine Sale Transaction"). To that end, on August 21, 2015, the Debtor filed a motion to seeking approval of the retention of Thomassen Amcot International LLC and Axford Consulting LP, as a non-exclusive broker in connection with a sale of the Turbine Assets [Dkt. No. 197] and the related motion to seal certain exhibits thereto [Dkt. No. 298], and on August 28, 2015, the Court approved the retention. Through the marketing of the Turbine Assets, the Debtor hopes to consummate a Turbine Sale Transaction that will increase Creditor recoveries.

**3.8    Motion Related to the Assumption and Rejection of Leases.** On June 12, 2015, the Debtor filed a motion seeking a 90-day extension of the deadline under section 365(d)(4) of the Bankruptcy Code by which to assume or reject that certain lease relating to the

-16-

Debtor's office space located in Victoria, Texas (the "Victoria Lease") [Dkt. No. 195].  On July 7, 2015, the Bankruptcy Court entered an order extending the time to assume or reject the Victoria Lease [Dkt. No. 232].  The deadline for the Debtor to assume or reject the Victoria Lease is October 5, 2015.

**3.9     Motion to Extend the Exclusive Periods to File and Solicit Acceptances of a Chapter 11 Plan**.  On June 17, 2015, the Debtor filed a motion to extend the exclusive periods to file and solicit acceptances of a chapter 11 plan [Dkt. No. 198]. On June 24, 2015, the Bankruptcy Court entered an agreed order, by the Debtor and the Committee, extending the Exclusive Periods [Dkt. No. 211].  The Debtor's exclusive period to file a chapter 11 plan was extended through and including August 6, 2015.  On August 5, 2015, the Debtor and the Committee filed a stipulated order extending the exclusive period to file a chapter 11 plan through September 8, 2015.  On August 6, 2015, the Bankruptcy Court entered the stipulated order.  On August 20, 2015, the Debtor filed the *Debtor's Expedited Third Motion for Entry of an Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Exclusive Periods to File and Solicit Acceptances of a Chapter 11 Plan* [Dkt. No. 296], pursuant to which the Debtor sought approval to extend the Debtor's exclusive period to file a chapter 11 plan and the Debtor's exclusive period to solicit acceptances of a chapter 11 plan through and including October 23, 2015.  On September 7, 2015, the Debtor and the Committee filed an agreed order extending the exclusive period to solicit acceptances of a chapter 11 plan through October 23, 2015.  On September 8, 2015, the Bankruptcy Court entered the agreed order.

**3.10     Committee's Motion for an Order Directing the Examination of, and Production of Documents from, the Debtor**.  On June 18, 2015, the Committee filed a motion seeking an order authorizing and directing the Committee to conduct an examination of the Debtor pursuant to Bankruptcy Rule 2004 [Dkt. No. 204].  On June 23, 2015, the Bankruptcy Court entered an order directing the examination and production of documents from the Debtor (the "2004 Order") [Dkt. No. 209].  Pursuant to the 2004 Order, the Debtor produced the requested documents to the Committee.

**3.11     Committee's Motion for an Order Directing the Examination of, and Production of Documents from, PRE**.  On June 18, 2015, the Committee filed a motion seeking an order authorizing and directing the Committee to conduct an examination of PRE pursuant to Bankruptcy Rule 2004 [Dkt. No. 203].  On June 23, 2015, the Bankruptcy Court entered an order directing the examination and production of documents from the Debtor (the "PRE 2004 Order") [Dkt. No. 208].  Pursuant to the PRE 2004 Order, PRE produced certain of the requested documents to the Committee.

**3.12     The Key Employee Plans Motion**.  On July 21, 2015, the Debtor filed a motion seeking authorization to implement a key employee incentive plan (the "KEIP"), a key employee retention plan (the "KERP", and together with the KEIP, the "Key Employee Plans"), and to pay severance claims to certain critical employees of the Debtor [Dkt. No. 257].  On July 30, 2015, the Bankruptcy Court entered an order authorizing the Key Employee Plans and the severance payments [Dkt. No. 268].

3.13     **Claims Process and Bar Date**.

      3.13.1  **Schedules and Statements**.  On April 22, 2015, the Debtor filed with the Bankruptcy Court a statement of financial affairs, and schedules of assets, liabilities and executory contracts and unexpired leases (collectively, the "Schedules") [Dkt. Nos. 138, 139].

      3.13.2  **Bar Dates**.  August 10, 2015 was the last date by which holders of certain prepetition claims against the Debtor were required to file proofs of claim and September 8, 2015 is the last date by which governmental units (as such term is defined in section 101(27) of the Bankruptcy Code) are required to file proofs of claim.

      3.13.3  **Claims Reconciliation**. Approximately 176 proofs of claims have been filed against the Debtor, 159 of which are claims relating to the 2015 Notes and 2017 Notes.

## 4.     SUMMARY OF THE PLAN.

### 4.1     Purpose of the Plan.

The Debtor is proposing the Plan over the alternative of converting the Debtor's bankruptcy case to chapter 7 of the Bankruptcy Code because the Debtor believes that (i) the Plan provides a more orderly liquidation and a greater recovery to Creditors than a chapter 7 liquidation, and (ii) the Plan avoids unnecessary costs to the Debtor's estate which would accrue should the Debtor's bankruptcy case be converted to chapter 7 of the Bankruptcy Code.

### 4.2     Classification of Classified Claims and Equity Interests under the Plan.

The categories of Claims and Equity Interests listed in Article III of the Plan classify Claims and Equity Interests that are required to be designated in classes pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and their treatment is set forth in Article II of the Plan. Classification of Claims and Equity Interests in the Plan is for all purposes, including voting, confirmation and distribution pursuant to the Plan.

A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class only to the extent that any portion of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is placed in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date. Notwithstanding any Distribution provided for in the Plan, no Distribution on account of any Claim or Equity Interest is required or permitted unless and until such Claim or Equity Interest becomes an Allowed Claim or Allowed Equity Interest, as the case may be, which might not occur, if at all, until after the Effective Date.

      4.2.1  **Administrative Claims**.  On, or as soon as reasonably practicable after (i) the Initial Distribution Date, if such Administrative Claim is an Allowed Administrative Claim

as of the Effective Date or (ii) the date on which such Administrative Claim becomes an Allowed Administrative Claim or as otherwise determined by the Debtor, with the consent of the Committee, or Liquidating Trustee, as applicable, each Holder of an Allowed Administrative Claim (other than a Claim for Professional Fees or U.S. Trustee Fees) shall receive, in full settlement, satisfaction and release of, and in exchange for, such Allowed Administrative Claim, (a) Cash in an amount equal to the unpaid amount of such Allowed Administrative Claim or (b) such other treatment as may be agreed upon by such Holder and the Debtor, with the consent of the Committee, or the Liquidating Trustee, as applicable; provided, however, that the Liquidating Trustee shall be authorized to pay Allowed Administrative Claims that arise in the ordinary course of the Debtor's business, in full, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

The Administrative Claims Bar Date, which is the last date for asserting an Administrative Claim (other than Claims for Professional Fees or U.S. Trustee Fees), shall be thirty (30) days after the Effective Date.  Any Holder of an Administrative Claim that does not File a Proof of Claim for such Administrative Claim and serve the Proof of Claim on counsel to the Debtor or the Liquidating Trustee, as applicable, by the Administrative Claims Bar Date, shall be forever barred from asserting such Administrative Claim against the Debtor, the Estate, its successors or property, and such Administrative Claim shall be deemed discharged and released as of the Effective Date.  Objections to such Administrative Claims must be Filed and served on the requesting party by no later than sixty (60) days after the Effective Date.  Unless the Debtor, the Committee, or the Liquidating Trustee, as applicable, or another party in interest objects to a Proof of Claim for such Administrative Claim within such time period, such Administrative Claim shall be deemed Allowed in the amount asserted.  In the event that the Debtor, the Committee, the Liquidating Trustee or another party in interest objects to a Proof of Claim for such Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

4.2.2  **Priority Tax Claims**.  On, or as soon as reasonably practicable after (i) the Initial Distribution Date, if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim against the Debtor shall receive, (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by such Holder and agreed to and paid by the Debtor, with the consent of the Committee, or the Liquidating Trust, as applicable, provided that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date without any further notice to or action, order, or approval of the Bankruptcy Court or (c) as determined by the Debtor, with the consent of the Committee, or Liquidating Trustee, as applicable, Cash paid by the Liquidating Trust in the aggregate amount of such Allowed Priority Tax Claim, payable in installment payments over a period not more than five years from the Petition Date with payment of interest at a fixed annual rate to be determined by the Bankruptcy Court, all in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

4.2.3  **Professional Fees**.  Notwithstanding any other provision of the Plan concerning Administrative Claims, any Professional seeking an award by the Bankruptcy Court

-19-

of an Allowed Administrative Claim on account of Professional Fees incurred from the Petition Date through and including the Effective Date (i) shall, no later than forty-five (45) days after the Effective Date, File a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through and including the Effective Date and (ii) shall receive, as soon as reasonably practicable after such claim is Allowed, in full settlement, satisfaction and release of, and in exchange for, such Allowed Administrative Claim, Cash in an amount equal to the unpaid amount of such Allowed Administrative Claim in accordance with the order relating to or allowing any such Administrative Claim.  Objections, if any, to such final fee applications must be Filed and served on the requesting party and the Liquidating Trustee no later than twenty (20) days from the date on which each such final fee application is served and Filed.   After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court.

    4.2.4 **Payment of Statutory Fees**.  All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.   After the Effective Date, the Liquidating Trustee shall pay, in accordance with the Bankruptcy Code and the Bankruptcy Rules, all fees payable pursuant to 28 U.S.C. § 1930 that accrue before or after the Effective Date.

    4.2.5 **Class 1 (Priority Non-Tax Claims)**.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on or as soon as reasonably practicable after (i) the Initial Distribution Date, if such Priority Non-Tax Claim is an Allowed Priority Non-Tax Claim as of the Effective Date or (ii) the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction of such Claim, one of the following treatments, as determined by the Debtor, with the consent of the Committee, or the Liquidating Trustee, as the case may be: (a) full payment in Cash of its Allowed Priority Non-Tax Claim or (b) treatment of its Allowed Priority Non-Tax Claim in a manner that leaves such Claim Unimpaired.

    Class 1 is Unimpaired by the Plan.  Holders of Priority Non-Tax Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are therefore not entitled to vote to accept or reject the Plan.

    4.2.6 **Class 2 (Secured Claims)**.  Except to the extent that a Holder of an Allowed Secured Claim agrees to different treatment, on or as soon as reasonably practicable after (i) the Initial Distribution Date, if such Secured Claim is an Allowed Secured Claim as of the Effective Date or (ii) the date on which such Secured Claim becomes an Allowed Secured Claim, each Holder of an Allowed Secured Claim shall receive, in full and final satisfaction of such Claim, as determined by the Debtor, with the consent of the Committee, or the Liquidating Trustee, as the case may be: (i) the collateral securing such Allowed Secured Claim; (ii) Cash in an amount equal to the value of the collateral securing such Allowed Secured Claim; or (iii) such other treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be rendered Unimpaired.

Class 2 is Unimpaired by the Plan. Holders of Secured Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are therefore not entitled to vote to accept or reject the Plan.

        4.2.7   **Class 3 (General Unsecured Claims)**. On or as soon as reasonably practicable after (i) the Initial Distribution Date, if such General Unsecured Claim is an Allowed General Unsecured Claim as of the Effective Date or (ii) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata Share of the Liquidating Trust Interests. The 2015 Noteholder Claims shall be Allowed in the aggregate amount of $61,922,933 including accrued and unpaid prepetition interest. The 2017 Noteholder Claims shall be Allowed in the aggregate amount of $165,108,105 including accrued and unpaid prepetition interest. Each holder of a Class 3 Claim (other than a Noteholder Claim) shall be permitted make a Convenience Election to reduce its Claim to $3,000 and receive, in lieu of its Pro Rata Share of the Liquidating Trust Interests, in full and final satisfaction of such Claim, a one-time payment in Cash of twenty percent (20%) of the Allowed amount of such Claim. For the avoidance of doubt, any such holder who makes the aforementioned Convenience Election shall not be entitled to receive any other recovery or distribution on account of such Claim.

Class 3 is Impaired by the Plan. Holders of General Unsecured Claims in Class 3 are entitled to vote to accept or reject the Plan.

        4.2.8   **Class 4 (Subordinated Claims)**. Holders of Subordinated Claims shall neither receive nor retain any property under the Plan. On the Effective Date, all Subordinated Claims shall be discharged.

Class 4 is Impaired by the Plan. Holders of Subordinated Claims in Class 4 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are therefore not entitled to vote to accept or reject the Plan.

        4.2.9   **Class 5 (Equity Interests)**. Holders of Equity Interests shall neither receive nor retain any property under the Plan. All Equity Interests shall be cancelled and of no further force or effect and all Claims Filed on account of Equity Interests shall be deemed disallowed by operation of the Plan.

Class 5 is Impaired by the Plan. Holders of Equity Interests in Class 5 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are therefore not entitled to vote to accept or reject the Plan.

        4.2.10  **Class 6 (Intercompany Claims)**. Holders of Intercompany Claims shall neither receive nor retain any property under the Plan. All Intercompany Claims shall be released and of no further force or effect.

Class 6 is Impaired by the Plan. Holders of Intercompany Claims in Class 6 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are therefore not entitled to vote to accept or reject the Plan.

4.2.11 **Non-Consensual Confirmation**.  In the event that any Impaired Class of Claims entitled to vote does not accept the Plan by the requisite majorities required by section 1126(c) of the Bankruptcy Code, the Debtor reserves the right to (i) modify the Plan in accordance with Section XI.B. of the Plan and/or (ii) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code notwithstanding such lack of acceptance.

4.2.12 **Elimination of Vacant Classes**.  Any Class of Claims or Equity Interests that is not occupied as of the date of the commencement of the Confirmation Hearing by at least one Allowed Claim or Allowed Equity Interest, as applicable, or at least one Claim or Equity Interest, as applicable, temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for purposes of (i) voting on the acceptance or rejection of the Plan and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

**4.3    The Liquidating Trust**.

4.3.1 **Establishment of the Liquidating Trust**.  On the Effective Date, the Debtor, on its own behalf and on behalf of the Holders of Allowed General Unsecured Claims, shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust in accordance with and pursuant to the terms of the Liquidating Trust Agreement.  The Liquidating Trustee and the Liquidating Trust shall be subject to oversight by the Liquidating Trust Committee as provided in the Liquidating Trust Agreement. The Liquidating Trust Agreement shall be in form and substance acceptable to the Committee.

4.3.2 **Purpose of Liquidating Trust**.  The Liquidating Trust is intended to be classified for U.S. federal income tax purposes as a "liquidating trust" and shall be established for the sole purpose of liquidating the Liquidating Trust Assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

4.3.3 **Assets of the Liquidating Trust**.  The Debtor shall transfer all of the Liquidating Trust Assets to the Liquidating Trust in accordance with sections 1123 and 1141 of the Bankruptcy Code and pursuant to the terms of the Plan. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtor shall be released from all liability with respect to the delivery of such distributions and the Debtor shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.  Any recoveries on account of the Liquidating Trust Assets shall be distributed to Beneficiaries in accordance with the Plan and Liquidating Trust Agreement.  To the extent that any Liquidating Trust Assets cannot be transferred to the Liquidating Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Liquidating Trust Assets shall be deemed to have been retained by the Liquidating Debtor and the Liquidating Trustee shall be deemed to have been designated as a representative of the Liquidating Debtor pursuant to section 1123(b)(3)(B) of the Bankruptcy

Code to enforce and pursue such Liquidating Trust Assets on behalf of the Liquidating Debtor. Notwithstanding the foregoing, all proceeds of such Liquidating Trust Assets shall be transferred to the Liquidating Trust to be distributed to Beneficiaries consistent with the terms of the Plan and the Liquidating Trust Agreement.

4.3.4 **Certain Federal Income Tax Matters**. For U.S. federal income tax purposes, the Debtor, the Liquidating Trustee and the Beneficiaries will treat the transfer of assets to the Liquidating Trust as a transfer by the Debtor of the Liquidating Trust Assets (other than the Liquidating Trust Assets allocable to the Disputed Claims Reserve) to the Beneficiaries, followed by a transfer of such Liquidating Trust Assets by the Beneficiaries to the Liquidating Trust.  Accordingly, for U.S. federal income tax purposes, the Liquidating Trust should be treated as one or more grantor trusts, and the Beneficiaries receiving Liquidating Trust Interests should be treated as the grantors and deemed owners of their representative share of the Liquidating Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

The Liquidating Trustee shall file Tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section IV.C.4. of the Plan. The Liquidating Trustee shall also annually send to each Beneficiary a separate statement setting forth the Beneficiary's share of items of income, gain, loss, deduction, or credit and shall instruct all such Beneficiaries to report such items on their federal income Tax returns or to forward the appropriate information to the Beneficiary with instructions to report such items on their federal income tax returns. The Liquidating Trustee shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any taxing authority.

As soon as possible after the Effective Date, the Liquidating Trustee shall make or cause to be made a good faith valuation of the Liquidating Trust Assets. Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties including the Debtor, the Liquidating Trustee, and Beneficiaries) for all federal income tax purposes.

Subject to definitive guidance from the U.S. Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee shall (i) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtor, the Liquidating Trustee, and Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

The Liquidating Trustee shall be responsible for payment, out of the Liquidating Trust Assets, of any U.S. federal, state, local, or non-U.S. taxes imposed on the Liquidating Trust or the Liquidating Trust Assets, including the Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such U.S. federal, state, local, or non-U.S. Taxes

-23-

attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidating Trustee as a result of the resolution of such Disputed Claims.

The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

See paragraph 8.3 below for a discussion of the U.S. federal tax treatment of the Liquidating Trust.

### 4.3.5   **Rights and Powers of the Liquidating Trust and the Liquidating Trustee**.

(a)      The Liquidating Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including without limitation, the right to (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (ii) prosecute, settle, abandon or compromise any Causes of Action; (iii) make Distributions contemplated by the Plan and the Liquidating Trust Agreement, (iv) establish and administer any necessary reserves for Disputed Claims that may be required; (v) object to Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (vi) employ and compensate professionals (including professionals previously retained by the Debtor and/or the Committee), provided, however, that any such compensation shall be made only out of the Liquidating Trust Assets; and (vii) file all federal, state and local Tax returns if necessary.

(b)      The Liquidating Trust shall assume any outstanding responsibility of the Debtor under the Plan and the Debtor shall provide the Liquidating Trustee with such information as may be reasonably requested by the Liquidating Trustee regarding the claims register for purposes of making the Distributions contemplated by the Plan and the Liquidating Trust Agreement.

(c)      In connection with the transfer of the Liquidating Trust Assets, any attorney-client privilege, work-product privilege or other privilege or immunity attaching to any documents or communications (whether written or oral) shall be transferred to the Liquidating Trust and shall vest in the Liquidating Trust.  The Confirmation Order shall provide that the Liquidating Trust's receipt of transferred privileges shall be without waiver in recognition of the joint and/or successorship interest in prosecuting claims on behalf of Debtor's Estate.

4.3.6    **Substitution of the Liquidating Trust for the Debtor**.

On the Effective Date, the Liquidating Trust shall be deemed to be substituted as the party in lieu of the Debtor in all pending matters including but not limited to (i) motions, contested matters and adversary proceeding pending in the Bankruptcy Court, and (ii) all matters pending in any courts, tribunals, forums or administrative proceedings outside of the Bankruptcy Court without the need or requirement for the Liquidating Trustee to File motions or substitutions of parties and counsel.

4.3.7    **Appointment of the Liquidating Trust Committee**.  On or prior to the Confirmation Date, the Committee shall appoint the members of the Liquidating Trust Committee.  Each member of the Liquidating Trust Committee will be entitled to vote on all matters in accordance with the Liquidating Trust Agreement.

4.3.8    **Liquidating Trust Interests**.  On the Effective Date, each Holder of an Allowed General Unsecured Claim shall, by operation of the Plan, receive its Pro Rata Share of the Liquidating Trust Interests.  Liquidating Trust Interests shall be reserved for Holders of Disputed General Unsecured Claims and issued by the Liquidating Trust to, and held by the Liquidating Trustee in, the Disputed Claims Reserve pending allowance or disallowance of such Claims. No other entity shall have any interest, legal, beneficial, or otherwise, in the Liquidating Trust, its assets or Causes of Action upon the assignment and transfer of such assets to the Liquidating Trust.

4.3.9    **Liquidating Trust Distributions**.

(a)    Initial Distributions.  On the Initial Distribution Date, the Liquidating Trustee shall make, or shall make adequate reserves in the Disputed Claims Reserve for, the Distributions required to be made under the Plan to Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims and Allowed General Unsecured Claims.  The Liquidating Trustee shall not make any Distributions of Liquidating Trust Assets to the Beneficiaries unless the Trustee retains and reserves in the Disputed Claims Reserve such amounts as are reasonably necessary to satisfy amounts that would have been distributed in accordance with the Liquidating Trust Agreement in respect of Disputed Claims if the Disputed Claims were determined to be Allowed Claims immediately prior to such proposed distribution to Beneficiaries.

(b)    Subsequent Distributions.  The Liquidating Trustee shall make the interim and final Distributions of Cash in accordance with the Plan and the Liquidating Trust Agreement.

**4.4    Distributions**.

4.4.1    **Manner of Payment under the Plan**.  At the option of the Debtor, with the consent of the Committee, or the Liquidating Trustee, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements. Cash payments made pursuant to the Plan in the form of

-25-

checks issued by the Debtor or Liquidating Trustee shall be null and void if not cashed within 120 days of the date of the issuance thereof.  Requests for reissuance of any check shall be made directly to the Liquidating Trustee.

4.4.2   **Timing of Distributions**.  Except as otherwise provided in the Plan or as may be ordered by the Bankruptcy Court, Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date and that are entitled to receive Distributions under the Plan shall be made on the Initial Distribution Date.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Distributions on account of Claims that become Allowed after the Effective Date shall be made pursuant to Section VII.D. of the Plan.

4.4.3   **Distributions by Disbursing Agent**.  The Liquidating Trustee, or its agent, shall serve as Disbursing Agent on behalf of the Estate (on and after the Effective Date) under the Plan and shall make all Distributions required under the Plan.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Liquidating Trust without further order of the Bankruptcy Court.

4.4.4   **Delivery of Distributions and Undeliverable or Unclaimed Distributions**.

Except as otherwise provided in the Plan, subject to Bankruptcy Rule 9010, all distributions to any Holder of an Allowed Claim shall be made at the address of such Holder as set forth on the Schedules Filed or on the books and records of the Debtor or its agents, as applicable, unless the Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a Proof of Claim by such Holder that contains an address for such Holder different from the address reflected on the Schedules.

In the event that any Distribution to any Holder is returned as undeliverable, the Liquidating Trustee shall use commercially reasonable efforts to determine the current address of such Holder, but no Distribution to such Holder shall be made unless and until the Liquidating Trustee has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; <u>provided</u> that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code upon the expiration of the later of three (3) months from the Effective Date and the date such Distribution was returned

undeliverable. After such date, all unclaimed property or interest in property shall revert to the Liquidating Trust for distribution on account of other Allowed Claims, and the Claim of the Holder originally entitled such unclaimed property or interest in property shall be discharged and forever barred.

       4.4.5   **Record Date for Distributions**.   As of the close of business on the Distribution Record Date, the transfer register for any Claims, for the purposes of Distributions shall be closed, and there shall be no further changes in the record Holders of any Claims. The Debtor shall have no duty to recognize the transfer of, or the sale of any interest in, any Claims occurring after the close of business on the Distribution Record Date and shall be entitled for all purposes relating to the Plan to recognize, distribute to and deal with only those record Holders of Claims stated on the transfer books and records as maintained by the Debtor or its agents, as the case may be, as of the close of business on the Distribution Record Date.

       4.4.6   **Allocation of Plan Distributions between Principal and Interest**.   To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the Distribution exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

       4.4.7   **Fractional Dollars; De Minimis Distributions**.   Notwithstanding any other provision of the Plan to the contrary, (a) the Disbursing Agent shall not be required to make Distributions or payments of fractions of dollars, and whenever any Distribution of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down and (b) the Disbursing Agent shall have no duty to make a Distribution on account of any Allowed Claim (i) if the aggregate amount of all Distributions authorized to be made on such date is less than $20,000, in which case such Distributions shall be deferred to the next Distribution date, (ii) if the amount to be distributed to a Holder on the particular Distribution date is less than $100.00, unless such Distribution constitutes the final Distribution to such Holder, or (iii) the amount of the Final Distribution to such Holder is less than $25.00, in which case such Distribution shall revert to the Liquidating Trust for Distribution on account of other Allowed Claims.

       4.4.8   **No Distribution in Excess of Allowed Amount of Claim**. Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distributions, which individually or in the aggregate, exceed of the Allowed amount of such Claim.

       4.4.9   **Setoffs**. The Debtor or the Liquidating Trust may, but shall not be required to, set-off against, or recoup from, any Claim (for purposes of determining the Allowed amount of such Claim on which a distribution shall be made) other than Noteholder Claims, any claims of any nature whatsoever that the Debtor or the Liquidating Trust may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall

-27-

constitute a waiver or release by the Debtor or the Liquidating Trust of any such claim the Debtor or the Liquidating Trust may have against the Holder of such Claim.

4.4.10 **Compliance with Tax Requirements**.  In connection with the Plan and all Distributions thereunder, to the extent applicable, the Debtor and the Liquidating Trustee are authorized to take any and all actions that may be necessary or appropriate to comply with all Tax withholding and reporting requirements imposed by any federal, state, local or foreign Taxing authority, and all Distributions pursuant to the Plan shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall be authorized to require each Creditor to provide it with an executed Form W-9 or similar Tax form as a condition precedent to being sent a Distribution. If a Holder of an Allowed General Unsecured Claim does not provide the Liquidating Trustee with an executed Form W-9 or similar form within ninety (90) days of written request, said Holder shall be deemed to have forfeited its Distribution.

4.4.11 **Release of Liens**.  Except as otherwise provided by Article III of the Plan or in any contract, instrument, release or other agreement or document created or assumed in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article VI of the Plan, all mortgages, deeds of trust, liens, pledges or other security interests against the property of the Debtor's Estate shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, liens, pledges or other security interests shall revert to the Estate.

4.4.12 **Subordination**.

(a)    Preservation of Subordination Rights by the Estate.

Except as otherwise provided in the Plan, all subordination rights and claims relating to the subordination by the Debtor or the Liquidating Trustee of any Allowed Claim shall remain valid, enforceable and unimpaired in accordance with section 510 of the Bankruptcy Code or otherwise.

(b)    Waiver by Creditors of all Subordination Rights.

Except as otherwise ordered by the Bankruptcy Court, each Holder of a Claim shall be deemed to have waived all contractual, legal and equitable subordination rights that they may have, whether arising under general principles of equitable subordination, section 510(c) of the Bankruptcy Code or otherwise, with respect to any and all Distributions to be made under the Plan, and all such contractual, legal or equitable subordination rights that each Holder has individually and collectively with respect to any such Distribution made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined.

**4.5    Procedures Resolving Disputed Claims**.  Article VII of the Plan sets forth the procedures for resolving disputed Claims, including procedures for (i) objecting to Claims, (ii) seeking estimation of Claims, and (iii) the treatment of Disputed Claims.  Additionally, Article

VII includes a description of Claims that are deemed to be Disallowed pursuant to the terms of the Plan.

### 4.6    Vesting of Assets and Dissolution.

On the Effective Date, the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Claims, Equity Interests, liens, charges or other encumbrances, except as set forth in the Plan. The Liquidating Trustee is authorized, without the need for any further action or formality which might otherwise be required under applicable non-bankruptcy laws, to dissolve and wind down the Remaining Subsidiaries.

On the Effective Date, the Retained Assets, including the D&O Policies, will vest in the Liquidating Debtor free and clear of all Claims, Equity Interests, liens, charges or other encumbrances.  For so long as any Retained Assets exist, the Liquidating Debtor will continue to exist and be subject to the supervision of the Bankruptcy Court.  On the Effective Date, the Liquidating Debtor Representative will be appointed the sole shareholder, member, director and officer of the Liquidating Debtor.  The Liquidating Debtor Representative is authorized, without the need for any further action or formality which might otherwise be required under applicable non-bankruptcy laws, to (a) dissolve the Liquidating Debtor or to merge the Liquidating Debtor into the Liquidating Trust, and (b) to receive compensation and employ and compensate professionals; provided, however, that any such compensation shall be made either out of the Liquidating Debtor Funds, or to the extent there is available insurance that provides coverage, out of insurance proceeds.

As of the Effective Date, or as soon as practicable thereafter, and without the need for any further order of the Bankruptcy Court, action or formality which might otherwise be required under applicable non-bankruptcy laws, the Debtor may be (a) dissolved without the need for any filings with the Secretary of State or other governmental official in the Debtor's state of incorporation, or (b) merged into or with the Liquidating Trust.

On the Effective Date or as soon as practicable thereafter, the Liquidating Debtor Representative or the Liquidating Trustee, as applicable, shall consummate, pursuant to section 1123(a)(5)(D) of the Bankruptcy Code, all remaining transactions and sales of property, if any.

On the Effective Date, any provision in the organizational documents (as the same may be amended or restated from time to time) of the Debtor requiring dissolution, liquidation, or withdrawal of a member upon insolvency, bankruptcy or the filing of Bankruptcy Case: (a) is deemed waived and of no further force and effect; and (b) any action taken to prevent or revoke such potential dissolution or liquidation by the Debtor or Liquidating Debtor is ratified and deemed effective to prevent such dissolution or liquidation and the Debtor or Liquidating Debtor shall continue its existence regardless of any such provision.

### 4.7    Reservation of Rights Regarding Causes of Actions and Coverage Claims.

The Debtor, and after the Effective Date, the Liquidating Trustee (on behalf of the Liquidating Trust) reserves the right to pursue any and all Causes of Action (including any Avoidance Actions) not relinquished, released, compromised or settled in the Plan, or any Final

Order.  The Debtor, and after the Effective Date, the Liquidating Debtor, any Covered Person and the Liquidating Debtor Representative, reserves the right to pursue any and all Coverage Claims not relinquished, released, compromised or settled in the Plan, or any Final Order.  The Debtor hereby reserves the right (i) of the Liquidating Trust and the Liquidating Trustee, on behalf of the Liquidating Trust, to pursue, administer, settle, litigate, enforce and liquidate consistent with the terms and conditions of the Plan and the Liquidating Trust Agreement such Causes of Action (including any Avoidance Actions) and (ii) of the Liquidating Debtor Representative or any Covered Person to assert, pursue, administer, settle, litigate, enforce and liquidate any and all Coverage Claims.  The Liquidating Trustee shall, pursuant to section 1123 of the Bankruptcy Code and all applicable law, have the requisite standing to prosecute, pursue, administer, settle, litigate, enforce and liquidate any and all Causes of Action.  The Liquidating Debtor Representative, pursuant to section 1123 of Bankruptcy Code and all applicable law, has the requisite standing to assert, prosecute, pursue, administer, settle, litigate, enforce and liquidate any and all Coverage Claims.

Except for Causes of Action against a Person or Entity expressly waived, relinquished, released, compromised or settled in the Plan, or any Final Order, (a) the Debtor expressly reserves all Causes of Action and Coverage Claims for later adjudication and, therefore, no preclusion doctrine or other rule of law, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or *laches*, shall apply to such Causes of Action or Coverage Claims upon, after, or as a result of the confirmation or Effective Date of the Plan, or the Confirmation Order, (b) all Causes of Action or Coverage Claims held by the Estate shall survive Confirmation of the Plan and the commencement and prosecution of any Causes of Action shall not be barred or limited by any estoppels (judicial, equitable or otherwise), (c) the Liquidating Trust's, Liquidating Trustee's, the Liquidating Debtor Representative's and any Covered Person's rights to commence and prosecute Causes of Action and/or assert any Coverage Claims shall not be abridged, limited or altered in any manner by reason of Confirmation of the Plan, (d) no defendant party to any Cause of Action (including Avoidance Actions) or any cause of action relating to a Coverage Claim shall be permitted or entitled to assert any defense based, in whole or in part, upon Confirmation of the Plan, and Confirmation of the Plan shall not have any *res judicata* or collateral estoppels or preclusive effect upon the commencement and prosecution of Causes of Action or causes of action relating to Coverage Claims, and (e) the Debtor and the Liquidating Trustee, on behalf of the Liquidating Trust and any successors in interest thereto, expressly reserve the right to pursue or adopt any Causes of Action that are alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs and co-defendants in such lawsuits.

### 4.8     Directors and Officers; Equity Interests; Professionals for the Debtor.

On the Effective Date, the authority, power and incumbency of the Persons then acting as directors and officers of the Debtor shall be terminated and such directors and officers shall be deemed to have resigned.

On the Effective Date, all the Equity Interests in the Debtor (including all instruments evidencing such Equity Interests) shall be canceled and extinguished without further action under

-30-

any applicable agreement, law, regulation or rule.  On the Effective Date, the Liquidating Debtor shall issue one share of stock in the Liquidating Debtor to the Liquidating Debtor Representative, which will hold such share of stock, and such share of stock will remain outstanding until the Liquidating Debtor is dissolved in accordance with the Plan.

On the Effective Date, the Professionals for the Debtor shall be deemed to have completed their services unless they are retained by the Liquidating Trustee or the Liquidating Debtor Representative; provided, however, that the Professionals for the Debtor shall be permitted to File final applications for reasonable compensation and reimbursement of expenses through the Effective Date as allowed by the  Plan and/or to address matters relating to applications filed pursuant to sections 330 and 331 of the Bankruptcy Code.

**4.9    Operations of the Debtor Between the Confirmation Date and the Effective Date**.

During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to operate its business as debtor-in-possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

**4.10    Term of Injunctions or Stays**.

Unless otherwise provided, all injunctions or stays provided for in the Bankruptcy Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Bankruptcy Case is closed.

**4.11    Corporate Action**.

Prior to, on and after the Effective Date, all matters provided for under the Plan that otherwise would require approval of the shareholders or directors of the Debtor shall be deemed to have occurred and shall be in effect prior to, on and after the Effective Date pursuant to the applicable general corporation law of the jurisdiction in which the Debtor is organized without any requirement of further action by the shareholders or directors of the Debtor.

The entry of the Confirmation Order shall constitute the approval of the authorization for the Debtor to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and any documents contemplated to be executed therewith, prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order rule or regulation.

**4.12    Cancellation of Existing Agreements and Existing Equity Interests**.

On the Effective Date, except to the extent otherwise provided herein, any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtor giving rise to any Claim or Equity Interest shall be canceled, shall be of no

further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtor thereunder or in any way related thereto shall be discharged.

### 4.13    Authorization of Plan-Related Documentation.

All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan and any other agreement or document related to or entered into in connection with the Plan, shall become, and shall remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by such applicable agreement).

A responsible officer or director of the Debtor shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 4.14    Dissolution of Committee.

The Committee shall continue in existence through and including the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Bankruptcy Court or in the Plan or the Confirmation Order prior to the Effective Date.  On the Effective Date, the Committee shall be deemed dissolved, and its members and its Professionals shall be deemed released of all their duties, responsibilities and obligations in connection with the Bankruptcy Case or the Plan and its implementation, and the retention or employment of the Committee's Professionals shall terminate; provided, however, that the Committee shall continue to exist after the Effective Date solely to address matters relating to applications Filed pursuant to sections 330 and 331 of the Bankruptcy Code.

### 4.15    Exemption from Certain Fees and Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to this Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar Tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar Tax in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such Tax and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Tax.

### 4.16    Assumption and Rejection of Executory Contracts and Unexpired Leases.

Any executory contract or unexpired lease which has not expired by its own terms on or prior to the Effective Date, which has not been assumed, assumed and assigned, or rejected with the approval of the Bankruptcy Court, or which the Debtor has obtained the authority to reject but has not rejected as of the Effective Date, or which is not the subject of a motion to assume

the same pending as of the Effective Date, shall be deemed rejected by the Debtor on the Confirmation Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to sections 365(e) and 1123(b)(2) of the Bankruptcy Code.

**4.17    Rejection Damages Claims**.

Proofs of Claim for any Claim arising out of the rejection of an executory contract or an unexpired lease pursuant to the Plan shall be Filed with the Clerk of the Bankruptcy Court and served upon the Liquidating Trust not later than thirty (30) days after notice of the occurrence of the Confirmation Date has been served.  Any such Claims covered by the preceding sentence not Filed within such time shall be forever barred from assertion against the Debtor, its Estate, the Liquidating Trust, and their respective properties and interests.

**4.18    Indemnification Obligations**.

Any obligation of the Debtor pursuant to its corporate charter and bylaws or similar constituent agreements, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any Covered Persons pursuant to the Debtor's certificate of incorporation, bylaws, policy of providing employee indemnification, applicable state law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Covered Persons based upon any act or omission related to such Covered Persons' service with, for, or on behalf of the Debtor prior to the Effective Date with respect to all present and future actions, suits, and proceedings relating to the Debtor shall continue solely to the extent there is available insurance that provides coverage for such obligation.  The Liquidating Trust, the Liquidating Trustee, and their assets shall not be liable for any such obligations.

**4.19    D&O Policies**.

Notwithstanding anything contained in the Plan to the contrary, all of the D&O Policies in effect on the Effective Date, and any agreements, documents or instruments relating thereto, shall be continued.  To the extent any or all of the D&O Policies in effect on the Effective Date are considered to be executory contracts, then, notwithstanding anything contained in the Plan to the contrary, the Plan shall constitute a motion to assume such insurance policies.  The entry of the Confirmation Order shall constitute approval of the foregoing assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor, the Estate and all parties in interest in this Bankruptcy Case. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any advancement, indemnity or other obligations of the insurers under any of the D&O Policies.

**4.20    Conditions Precedent to Confirmation and Consummation of the Plan**.

Article VIII of the Plan sets forth the conditions that must occur prior to both Confirmation of the Plan and the occurrence of the Effective Date.  Article VIII also describes the Debtor's ability to waive such conditions, as well as the effect of non-occurrence of the

conditions to the Effective Date, including the vacation of the Confirmation Order.  If the Confirmation Order is vacated pursuant to Section VIII.E of the Plan, the Plan shall be null and void in all respects, and  nothing contained in the Plan shall constitute a waiver or release of any Claims or Equity Interests against the Debtor or release of any claims or interests by the Debtor or the Estate.

### 4.21    Compromise and Settlement of Claims, Equity Interests and Controversies.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved pursuant to the Plan or relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Claim or Equity Interest, or any Distribution to be made on account of such Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trustee may compromise and settle Claims against the Debtor and its Estate and Causes of Action against other Entities.

### 4.22    Limited Discharge of the Debtor and Injunction.

The entry of the Confirmation Order will operate as a general resolution with prejudice, as of the Effective Date, of all pending legal proceedings, if any, against the Debtor and its assets and properties and any proceedings not yet instituted against the Debtor or its assets or properties, except as otherwise provided in the Plan or the Confirmation Order.  Except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons who have held, hold, or may hold Claims against the Debtor are permanently enjoined on and after the Effective Date from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor, the Liquidating Debtor, or their property, the Liquidating Trust or the Liquidating Trustee, with respect to any such Claim, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any such Claim against the Debtor, the Liquidating Debtor, or their property, or the Liquidating Trust or the Liquidating Trustee, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor, the Liquidating Debtor, or their property, or the Liquidating Trust or the Liquidating Trustee, with respect to such Claim, (d) asserting any right of subrogation of any kind against any obligation due to the Debtor, the Liquidating Debtor, or the property of the Debtor, the Estate, or the Liquidating Debtor, with respect to any such Claim and (e) asserting any right of setoff or recoupment against the Debtor, the Estate or the Liquidating Debtor except as specifically permitted by section 553 of the Bankruptcy Code.  Unless otherwise provided in the Plan or the Confirmation Order, or by order of the Bankruptcy Court, all injunctions or automatic stays provided for in these cases pursuant to section 105, if any, or section 362 of the

Bankruptcy Code, or otherwise, and in existence on the Confirmation Date will remain in full force and effect until the Effective Date.

### 4.23    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, and except where such causes of action have been expressly released, the Liquidating Trustee or the Liquidating Debtor Representative, as applicable, shall retain and may enforce all rights to assert, commence and pursue, as appropriate, any and all Causes of Action or Coverage Claims, whether arising before or after the Petition Date, including any actions specifically enumerated in any supplemental documents, and their rights to commence, prosecute, or settle such Causes of Action or Coverage Claims shall be preserved notwithstanding the occurrence of the Effective Date.  The Liquidating Trustee may pursue the Causes of Action, as appropriate, in accordance with the best interests of the Beneficiaries.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action or Coverage Claim against them as any indication that the Debtor, the Liquidating Trustee or the Liquidating Debtor Representative, as applicable, will not pursue any and all available Causes of Action or Coverage Claim against them. Except with respect to causes of action as to which the Debtor has released any Entity on or prior to the Effective Date, the Debtor, the Liquidating Trustee or the Liquidating Debtor Representative, as applicable, expressly reserve all rights to assert or prosecute any and all Causes of Action or Coverage Claims, against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action or Coverage Claim against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Liquidating Trustee or the Liquidating Debtor Representative, as applicable, expressly reserves all Causes of Action and Coverage Claims, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppels (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action or Coverage Claims upon, after, or as a consequence of the Confirmation or Consummation.

### 4.24    Releases by the Debtor.

As of the Effective Date, the Debtor, its Estate and, the Liquidating Trust will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date based on, or in any way relating to, the Debtor and its Remaining Subsidiaries, the conduct of the business of the Debtor and its non-Debtor subsidiaries, prepetition or postpetition purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtor, the Sale Transactions, the Bankruptcy Case, the Plan and any related agreements (including the Plan Supplement), or the Disclosure Statement, that could have been asserted at any time, past, present, or future, by or on behalf of the Debtor, or its Estate, against (a) any parent, subsidiary, successor, heir, executor and assign, accountant and other professional or representative when acting in any such capacity, excluding Netherland, Sewell &

Associates, Inc.; (b) any current and former investment banker, excluding Raymond James Financial, Inc. and its subsidiaries, financial advisor, restructuring advisor or attorney of the Debtor or the professionals employed by the Debtor's Board of Directors (including the Special Committee of the Board of Directors), in its capacity as such; and (c) the Committee, and each member, financial advisor, and attorney of the Committee, in its capacity as such; provided, however, that the foregoing shall not affect the liability or release of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.  For the avoidance of doubt, nothing contained in Section IX.D. of the Plan shall be deemed to release any person acting as a director or officer of the Debtor before the Petition Date.

       **4.25**    **Exculpation of Exculpated Parties**.

The Exculpated Parties shall neither have, nor incur, any liability to any Entity for any act taken or omitted to be taken in connection with, relating to, or arising out of, the Bankruptcy Case, formulating, negotiating, soliciting, preparing, disseminating, implementing, confirming, or effecting the Consummation of the Plan, the Disclosure Statement, the Plan Supplement, the administration of the Plan or the property to be distributed under the Plan or related to the issuance, distribution, and/or sale of any security, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan through and including the Effective Date; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted fraud, willful misconduct or gross negligence.

       **4.26**    **Limited Exculpation of Covered Persons**

The Covered Persons shall neither have, nor incur, any liability to any Entity for any act taken or omitted to be taken in connection with, relating to, or arising out of, (a) payments made pursuant to an order of the Bankruptcy Court, and (b) formulating, negotiating, soliciting, preparing, disseminating, implementing, confirming, or effecting the Consummation of the Plan, the Disclosure Statement, the Plan Supplement, the administration of the Plan or the property to be distributed under the Plan or related to the issuance, distribution, and/or sale of any security, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan through and including the Effective Date; provided, however, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted fraud, willful misconduct or gross negligence.

       **4.27**    **Immediate Binding Effect**.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, Liquidating Trust Agreement and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtor and any and all Holders of Claims against or Equity Interests in the Debtor (regardless of

whether such Claims or Equity Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtor. All Claims and debts shall be fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### 4.28    Modification of the Plan.

Subject to the limitations contained in the Plan, the Debtor, with the consent of the Committee, reserves the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtor, with the consent of the Committee, which consent shall not be unreasonably withheld, expressly reserves its right to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, the Liquidating Trust Agreement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI of the Plan.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof and prior to the Confirmation Date are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 4.29    Revocation or Withdrawal of the Plan.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date or the Effective Date and to file subsequent plans. If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption and assignment or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Equity Interests; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

5.      **FEASIBILITY**.

   **5.1      Financial Feasibility Analysis**.

          5.1.1   **Bankruptcy Code Standard**.  The Bankruptcy Code requires that, in order to confirm a plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

          5.1.2   **No Need for Further Reorganization of Debtor**.  The Plan provides for the liquidation and distribution of all of the Debtor's assets.  The Bankruptcy Court has authorized the Sale Transactions and the Debtor has closed such sales. The Cash generated by the Sale Transactions, the sale of the remaining assets transferred to the Liquidating Trust, the liquidation of the other assets and the prosecution of Causes of Action, as well as the funds already generated by the collection of accounts, should be sufficient to fund Distributions under the Plan and to establish a reasonable reserve, including the costs of administering the Liquidating Trust.  Accordingly, the Debtor believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor.

6.      **BEST INTERESTS OF CREDITORS AND ALTERNATIVES TO PLAN**.

   **6.1      Chapter 7 Liquidation**.

          6.1.1   **The Plan is in the Best Interests of Creditors**.   Notwithstanding acceptance of the Plan by an Impaired Class, in order to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Equity Interest in any such Impaired Class which has not voted to accept the Plan.  Accordingly, if an Impaired Class does not vote unanimously to accept the Plan, the best interests test under section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Equity Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtor were liquidated under chapter 7.

          The Debtor believes that the Plan satisfies the best interests test, because, among other things, the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation.

          In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of the properties securing their liens.  If any assets are remaining in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured

-38-

creditors with the same priority.  Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

Substantially all of the Debtor's assets have already been sold through the Sale Transactions.  Although the Plan effects a liquidation of the Debtor's remaining assets and a chapter 7 liquidation would have the same goal, the Debtor believes that the Plan provides the best source of recovery to Holders of Allowed General Unsecured Claims.  Liquidating the Debtor's estate under chapter 7 would not provide a timely Distribution to Holders of such Claims and would likely provide a smaller Distribution to Holders of such Claims because of the fees and expenses which would be incurred during a chapter 7 liquidation, including potential added time and expense incurred by the trustee and any retained professionals in familiarizing themselves with the Bankruptcy Case.  Attached as **Exhibit B** to this Disclosure Statement is a Chapter 11/7 Liquidation Analysis Comparison performed by the Debtor which substantiates the Debtor's view that the Debtor's Plan provides greater recoveries to Creditors than a chapter 7 liquidation.

Accordingly, the Debtor believes that the Plan is in the best interests of Creditors.

### 6.2    **Alternative Plan(s).**

The Debtor does not believe that there are any alternative plans.  The Debtor believes that the Plan, as described herein, enables Holders of Claims to realize the greatest possible value under the circumstances, and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## 7.    **RISK FACTORS.**

Holders of Claims who are entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement and the Plan, before deciding whether to vote to accept or reject the Plan.

### 7.1    **Financial Information; Disclaimer**.

Although the Debtor has used its best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available to the Debtor at the time of the preparation of the Plan and Disclosure Statement. While the Debtor expects that such financial information fairly reflects the financial condition of the Debtor, the Debtor is unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

### 7.2    **Failure to Confirm Plan**.

Even if the Impaired Classes accept or could be deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, (1) that the confirmation of the Plan not be followed by liquidation or a need for further financial

reorganization, unless, as is the case here, the Plan provides for such liquidation or reorganization, (2) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the Debtor were liquidated under chapter 7 of the Bankruptcy Code, and (3) that the Plan and the Debtor, as proponent of the Plan, otherwise comply with the applicable provisions of the Bankruptcy Code. Although the Debtor believes that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**7.3**     **Nonconsensual Confirmation**.

Pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan notwithstanding the rejection of the Plan by an Impaired Class of Claims or Equity Interests if at least one other Impaired Class has accepted the Plan (with such acceptance being determined without including the acceptance of any insider (as defined in section 101(31) of the Bankruptcy Code) in such Class) and, as to each Impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to Impaired Classes. In accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtor intends to request confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.

Although the Debtor believes that the Plan satisfies the requirements of section 1129(b), there is no guaranty that the Bankruptcy Court will reach that conclusion. Moreover, although the Debtor encourages all Creditors in an Impaired Class to vote in favor of the Plan and the Debtor believes that they are likely to have at least one Impaired Class vote in favor of the Plan, there is no guaranty that this will occur. If no Impaired Class votes in favor of the Plan, the Plan cannot be confirmed as written.

**7.4**     **Certain Bankruptcy Considerations**.

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.  In addition, although the Debtor believes that the Effective Date will occur prior to November 30, 2015, there can be no assurance as to such timing.

**7.5**     **Delays of Confirmation or Effective Date**.

Any delays of either confirmation or effectiveness of the Plan could result in, among other things, increased administrative costs, including professional fee claims.  These negative effects of delays of either confirmation or effectiveness of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court.

**7.6**     **The Debtor May Object to Amount or Classification of a Claim**.

Except as otherwise provided in the Plan, the Debtor and the Liquidating Trustee reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set

forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is or may become subject to an objection.  Any Holder of a Claim that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 7.7    Estimation of Claims.

The Allowed amount of Claims in each Class could be greater than projected, which in turn, could cause the amount of distributions to creditors to be reduced substantially.  Likewise, the amount of cash realized for the liquidation of the assets not sold pursuant to the Sale Transactions (including the Turbine Assets) could be less than projected, which could cause a reduction in the amount of distributions to creditors.

### 7.8    The Full Escrow Amount May Not be Released to the Debtor.

Although the Debtor does not anticipate that any significant disbursements will need to be made to Zedd, there can be no assurance that the full Zedd Escrow Amount will be released to the Debtor.

Additionally, the Debtor anticipates that the full Zorritos Escrow Amount will be released to the Debtor.  However, there can be no assurance that the full Zorritos Escrow Amount will be paid to the Debtor.

### 7.9    The Turbine Assets and All Claims and Causes of Action Shall Be Liquidating Trust Assets.

All property and assets of the Debtor that have neither been previously abandoned nor sold, including without limitation, any Turbine Assets, any Turbine Proceeds, any proceeds from the Sale Transactions (including the Debtor's residual interest in the Escrowed Amounts), all Cash and Cash equivalents, all Claims and Causes of Action, all proceeds from any judgment or settlement related to such Claims and Causes of Action, the Books and Records, and other remaining assets of the Debtor shall be Liquidating Trust Assets as set forth in the Plan.  Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtor shall be released from all liability with respect to the delivery of such distributions and the Debtor shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.  Any recoveries on account of the Liquidating Trust Assets shall be distributed in accordance with the Liquidating Trust Agreement.

### 7.10    No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

**7.11** **No Representations Outside This Disclosure Statement Are Authorized**.

No representations concerning or related to the Debtor, the Bankruptcy Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

**7.12** **No Legal Or Tax Advice Is Provided To You By This Disclosure Statement**.

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Claim or Equity Interest Holder should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

**8.** **TAX CONSEQUENCES OF THE PLAN.**

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF PROCEEDS FROM CLAIMS INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN (NON-US) TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

The following discussion addresses certain United States federal income tax consequences of the consummation of the Plan. This discussion is based upon the United States Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed regulations thereunder, current administrative rulings, and judicial decisions as in effect on the date hereof, all of which are subject to change, possibly retroactively. No rulings or determinations by the Internal Revenue Service ("IRS") have been obtained or sought by the Debtor with respect to the Plan. An opinion of counsel has not been obtained with respect to the tax aspects of the Plan. This discussion does not purport to address the federal income tax consequences of the Plan to particular classes of taxpayers (such as foreign persons, S corporations, mutual funds, small business investment companies, regulated investment companies, broker-dealers, insurance companies, tax-exempt organizations and financial institutions) or the state, local or foreign income and other tax consequences of the Plan.

HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR ARE HEREBY INFORMED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED TO OR WRITTEN TO BE USED, AND CANNOT BE USED, BY SUCH HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED

-42-

ON THEM UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE PLAN; AND (C) SUCH HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### 8.1    Federal Income Tax Consequences to Holders of Claims and Equity Interests.

The U.S. federal income tax consequences to Holders of Allowed Claims arising from the distributions pursuant to the Plan may vary, depending upon, among other things: (a) the manner in which a Holder acquired an Allowed Claim; (b) the type of consideration received by the Holder of an Allowed Claim in exchange for the interest it holds; (c) the nature of the indebtedness owed to it; (d) whether the Holder previously claimed a bad debt or worthless securities deduction in respect of the Allowed Claim; (e) whether the Holder of the Allowed Claim is a citizen or a resident of the U.S. for tax purposes; (f) whether the Holder of the Allowed Claim reports income on the accrual or cash basis method of accounting; and (g) whether the Holder receives distributions in more than one taxable year. In addition, where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder and how long it has been held or is treated as having been held, and whether the Allowed Claim was acquired at a market discount.

In general, the receipt of Cash and/or interests in the Liquidating Trust in exchange for an Allowed Claim should result in the recognition of gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any interests in the Liquidating Trust received (other than any Cash or interests in the Liquidating Trust attributable to accrued but unpaid interest) and (ii) the Holder's tax basis in its Allowed Claim (other than any Claim for accrued but unpaid interest). Because Holders of Allowed Claims may receive additional consideration from the Disputed Claims Reserve, it is possible that losses with respect to their claims will be deferred until all assets are distributed by the Disputed Claims Reserve. If amounts are received by a Holder in more than one taxable year, a portion of such amounts may be characterized as interest.

If the Claim or Equity Interest in the Holder's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Holder held such Claim or Equity Interest for longer than one year or short-term capital gain or loss if the Holder held such Claim or Equity Interest for one year or less. If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation.

The Liquidating Trustee, in consultation with the Liquidating Trust Committee, will determine the fair market value of the assets transferred to the Liquidating Trust and, correspondingly, of the beneficial interests in the Liquidating Trust. These values must be used by the Debtor, the Liquidating Trustee, and all beneficiaries of the Liquidating Trust for all federal income tax purposes. It is possible that the IRS may disagree with the valuations for this

purpose. If the IRS were to successfully assert that different valuations should apply, the amount of taxable gain or loss recognized by Holders of Allowed Claims would be subject to adjustment.

Holders of Claims who were not previously required to include any accrued but unpaid interest in their gross income on a Claim may be treated as receiving taxable interest income taxable at tax rates for ordinary income to the extent any consideration they receive under the Plan is allocable to such interest. Holders of Claims previously required to include in their gross income any accrued but unpaid interest on a claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan. Under the Plan, to the extent that any Allowed Claim entitled to a Distribution is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the Distribution exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

A Holder of an Allowed Claim or Equity Interest who receives, in respect of its claim, an amount that is less than its tax basis in such claim or equity interest may be entitled to a bad debt deduction under section 166(a) of the Tax Code, a loss under section 165(a) of the Tax Code, or a worthless securities deduction under section 165(g) of the Tax Code. The rules governing the character, timing, and amount of these deductions depend upon the facts and circumstances of the Holder and the instrument with respect to which a deduction is claimed. Accordingly, Holders are urged to consult their tax advisors with respect to their ability to take such a deduction if either: (1) the Holder is a corporation; or (2) the Claim or Equity Interest constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the Holder or (b) a debt the loss from the worthlessness of which is incurred in the Holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of its Claim or Equity Interest may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Claim or Equity Interest.

Whether the Holder of Claims or Equity Interests will recognize a loss, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the Holder and its Claims or Equity Interests. Accordingly, Holders of Claims and Equity Interests should consult their own tax advisors.

A Holder of a Claim constituting any installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of section 453B of the Tax Code.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of the gain realized by a holder of a Claim who exchanges the Claim for consideration (or the right to receive consideration) on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of "market discount" on the Claim. In general, a debt instrument is considered to have been acquired with "market discount"

-44-

if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the Claim, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Gain, if any, recognized by a holder on the exchange of a Claim pursuant to the Plan that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).

Under backup withholding rules, a Holder of an Allowed Claim may be subject to backup withholding with respect to payments made pursuant to the Plan unless such Holder (i) is a corporation or is otherwise exempt from backup withholding and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of failure to report all dividend and interest income. Any amount withheld under these rules will be credited against the Holder's federal income tax liability. Holders of Claims may be required to establish an exemption from backup withholding or to make arrangements with regard to payment thereof.

### 8.2    Federal Income Tax Consequences to Debtor.

Taxpayers generally must include in gross income the amount of any cancellation of debt income, which is the difference between the amount of a taxpayer's indebtedness that is cancelled and the amount or value of the consideration exchanged therefore.   Even if indebtedness of the Debtor is discharged under the Plan, the Debtor should not recognize taxable cancellation of debt income if the discharge is pursuant to a Chapter 11 bankruptcy proceeding. Although the Debtor will not be required to recognize cancellation of indebtedness income, it must instead reduce certain tax attributes by the amount of unrecognized cancellation of indebtedness income after the determination of the tax for the year of discharge in the manner prescribed by section 108(b) of the Tax Code. Tax attributes include net operating losses ("NOLs"), capital losses and loss carryovers, certain tax credits and, subject to certain limitations, the tax basis of property.

Pursuant to the Plan, all of the Debtor's remaining assets other than those sold prior to the Effective Date will be transferred directly or indirectly to Holders of Allowed Claims in liquidation of the Debtor.  For federal income tax purposes, any such assets transferred to the Liquidating Trust will be treated by the Debtor and by the Beneficiaries as having been distributed to the Beneficiaries, with such Beneficiaries then transferring the assets to the Liquidating Trust in exchange for beneficial interests in the Liquidating Trust.  The Debtor will not retain a beneficial interest in the Liquidating Trust; instead, the beneficial interest in the Liquidating Trust will be held by the Beneficiaries.  It is intended that the Liquidating Trust be treated, for U.S. federal income tax purposes, as a liquidating trust and as a grantor trust, with the Beneficiaries receiving Liquidating Trust Interests being treated as the grantors and deemed owners of the Liquidating Trust Assets.

The Debtor's transfer of its assets pursuant to the Plan will constitute a taxable disposition of such assets, and the Debtor will recognize gain or loss based on the difference between the fair market value and the tax basis of the assets transferred. It is not known at the present time whether the transfer of the Debtor's assets will result in any gain to the Debtor. If such a transfer results in gain, it is not known at the present time whether the Debtor will have sufficient NOLs, current losses or loss carryforwards to offset that gain. If the transfer results in gain and the Debtor does not have NOLs, current losses or loss carryforwards to offset that gain, the transfer of such assets will result in federal income tax liability to the Debtor.  In addition, the Debtor may be subject to alternative minimum tax as a result of the transfer of assets.

### 8.3     Consequences of the Liquidating Trust.

The Liquidating Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Thus, the Liquidating Trust is intended to be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d). The provisions of the Liquidating Trust Agreement and the Plan are intended to satisfy the guidelines for classification as a liquidating trust that are set forth in Revenue Procedure 94-45, 1994-2 C.B. 684. Under the Plan, all parties are required to treat the Liquidating Trust as a liquidating trust, subject to contrary definitive guidance from the IRS. In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to sections 671 through 679 of the Tax Code, owned by the persons who are treated as transferring assets to the Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to challenge successfully the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Beneficiaries could vary from those discussed herein (including the potential for an entity-level tax).

Consistent with the intended treatment, Liquidating Trust beneficiaries will be treated for federal income tax purposes as the grantors and owners of undivided interests in the assets held by the Liquidating Trust. Except as described in "Consequences of the Disputed Claim Reserve", no tax should be imposed on the Liquidating Trust on earnings generated by the assets held by the Liquidating Trust.  Instead, each Beneficiary holding a beneficial interest in the Liquidating Trust must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the Liquidating Trust. None of the Debtor's loss carryforwards will be available to reduce any income or gain of the Liquidating Trust. Moreover, upon the sale or other disposition (or deemed disposition) of any Liquidating Trust Asset, each Beneficiary holding a beneficial interest in the Liquidating Trust must report on its federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of cash and/or the fair market value of any property received by the Liquidating Trust in exchange for the Liquidating Trust Asset so sold or otherwise disposed of and (2) such Beneficiary's adjusted tax basis in its share of the Liquidating Trust Asset. The character of any

-46-

such gain or loss to the Beneficiary will be determined as if such Beneficiary itself had directly sold or otherwise disposed of the Liquidating Trust Asset. The character of items of income, gain, loss, deduction and credit to any Beneficiary holding a beneficial interest in the Liquidating Trust, and the ability of the Beneficiary to benefit from any deductions or losses, may depend on the particular circumstances or status of the Beneficiary.

Given the treatment of the Liquidating Trust as a grantor trust, each Beneficiary holding a beneficial interest in the Liquidating Trust has an obligation to report its share of the Liquidating Trust's tax items (including gain on the sale or other disposition of a Liquidating Trust Asset) which is not dependent on the distribution of any cash or other Liquidating Trust Assets by the Liquidating Trust. Accordingly, a Beneficiary holding a beneficial interest in the Liquidating Trust may incur a tax liability as a result of owning a share of the Liquidating Trust Assets, regardless of whether the Liquidating Trust distributes cash or other assets. Although the Liquidating Trust Agreement provides that the Liquidating Trust will generally make distributions of cash at least quarterly, due to the requirement that the Liquidating Trust maintain certain reserves, the Liquidating Trust's ability to make current cash distributions may be limited or precluded. In addition, due to possible differences in the timing of income on, and the receipt of cash from the Liquidating Trust Assets, a Beneficiary holding a beneficial interest in the Liquidating Trust may be required to report and pay tax on a greater amount of income for a taxable year than the amount of cash received by the Beneficiary during the year.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (*e.g.*, income, gain, loss, deduction and credit). Each Beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Beneficiaries who received their interests in the Liquidating Trust in connection with the Plan.

### 8.4    Consequences of the Disputed Claim Reserve.

Under section 468B(g) of the Tax Code, amounts earned by an escrow agent, settlement fund or similar fund must be subject to current tax. Treasury Regulation section 1.468B-9 permits an election to be made to treat certain such funds as "disputed ownership funds" and sets forth the taxation of funds as to which such election has been made. Subject to contrary definitive guidance from the IRS or a court of competent jurisdiction (including the receipt by the Liquidating Trustee of an IRS private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidating Trustee will (A) elect to treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

Accordingly, the Disputed Claims Reserve will be subject to Tax annually on a separate entity basis on any net income earned with respect to the assets of the Liquidation Trust in such

reserves, and all distributions from such reserves (which distributions will be net of the related expenses of the reserve) will be treated as received by holders in respect of their Claims as if distributed by the Plan Debtors. All parties (including, without limitation, the Debtor, the Liquidating Trustee and the Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

NO STATEMENT IN THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE. THE DEBTOR AND THEIR PROFESSIONALS DO NOT ASSUME ANY RESPONSIBILITY OR LIABILITY FOR THE TAX CONSEQUENCES THE HOLDER OF A CLAIM MAY INCUR AS A RESULT OF THE TREATMENT AFFORDED ITS CLAIM UNDER THE PLAN AND DO NOT REPRESENT WHETHER THERE COULD BE ADDITIONAL TAX EXPOSURE TO THEMSELVES OR THEIR NON-DEBTOR AFFILIATES AS A RESULT OF THE PLAN.

## 9. CONCLUSION.

The Debtor believes that confirmation and consummation of the Plan is in the best interest of the Debtor, its estate and its creditors.  The Plan provides for an equitable distribution to creditors.  The Debtor believes that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a reduction in the distributions to Holders of Claims in certain classes. Consequently, the Debtor urges all eligible Holders in an Impaired Class to vote to ACCEPT the Plan, and to complete and return their Ballots so that they will be RECEIVED by the Balloting Agent on or before the Voting Deadline.

IN WITNESS WHEREOF, the Debtor has executed this Disclosure Statement this 25th day of September, 2015.

BPZ RESOURCES, INC.

By:   */s/ J. Durkin Ledgard*
      J. Durkin Ledgard
      Chief Legal Officer

**STROOCK & STROOCK & LAVAN LLP**
Kristopher M. Hansen (admitted *pro hac vice*)
Frank A. Merola (admitted *pro hac vice*)
Matthew G. Garofalo (admitted *pro hac vice*)
180 Maiden Lane
New York, NY 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

**HAWASH MEADE GASTON NEESE & CICACK LLP**
WALTER J. CICACK
Texas State Bar No. 04250535
2118 Smith Street
Houston, Texas  77002
Telephone: (713) 658-9001
Facsimile: (713) 658-9011

ATTORNEYS FOR THE DEBTOR AND DEBTOR-IN-POSSESSION